**In the Matter of the EXTRADITION OF Sukhminder SINGH a/k/a "Sukhi".**

**In the Matter of the EXTRADITION OF Ranjit Singh GILL a/k/a "Kukki".**

Magistrate Nos. 87–6160G–01, 87–6161G–01.

United States District Court, D. New Jersey.

July 29, 1988.

See also, D.C., 123 F.R.D. 108, D.C., 123 F.R.D. 127.

Daniel J. Gibbons, Asst. U.S. Atty., Fleming, Merrill, Roth & Russell, Newark, N.J., for plaintiff.

William M. Kunstler, Ronald L. Kuby, New York City, for defendants.

## OPINION

RONALD J. HEDGES, United States Magistrate.

## INTRODUCTION

Separate extradition hearings were conducted as to defendants Sukhminder Singh and Ranjit Singh Gill during the first week of February, 1988. The Court concluded that defendants were extraditable to the Republic of India. See Certifications of Extraditability and Orders of Commitment filed February 5, 1988 ("the Certifications").

On March 21, 1988 the United States Attorney advised the Court of the existence of substantial evidence that Special Assistant United States Attorney Judy G. Russell, who represented the Government in these proceedings, manufactured threats to herself and the Court. See Transcript of March 21, 1988 conference and Government Exhibits 1 through 4D. This led the Court to unseal certain portions of the hearing transcript. See Letter–Order filed March 22, 1988; Affidavit of Daniel J. Gibbons filed March 30, 1988. Thereafter, additional portions were unsealed. See Order filed April 13, 1988; Affidavit of Daniel J. Gibbons filed April 13, 1988.

The Government has moved to vacate the Certifications. The basis for the application is set forth in correspondence from United States Attorney Samuel A. Alito, Jr., dated March 28, 1988. This correspondence, which is attached to the Letter–Order filed March 29, 1988, provides, in pertinent part, that,

[a]lthough we believe that Ms. Russell's actions had no effect upon the Court's finding with respect to the extradition, we respectfully request that this Court schedule a rehearing of the evidence and make a new, independent finding with respect to the issue of extradition. We believe this is necessary in order to avoid any appearance of impropriety with respect to the Court's decision, and in order to erase any claim that the respondents' rights could have been impinged upon by the alleged conduct of the Special Assistant U.S. Attorney.

A review of the files in this matter reveals that the false statements first surfaced on January 14 or 15, 1988. Therefore, the only matters that could arguably have been affected are the hearings that took place after that time, specifically, the evidentiary hearings on the extradition issue.

Defendants, in turn, have moved to compel discovery. The basis for the motion is summarized as follows:

Both the court and counsel have noted that this case presents a unique and extraordinary factual situation. The very nature and seriousness of the prosecutorial misconduct is undoubtedly as shocking to the court as it is to counsel and the general public. The untoward consequences of the AUSA's acts permeated the conduct of the hearing and, undoubtedly, the ultimate decision.

The AUSA used the existence of these threats as the basis for various *in cam-*

*era* and *ex parte* representations, which resulted in the imposition of unprecedented security measures during the proceedings, including the chaining and shackling of the two respondents. She successfully opposed respondents' request for a brief adjournment of the hearing, preventing their most experienced trial counsel, William M. Kuntsler, from being present during three of the four days of hearings. As a further consequence, the AUSA obtained highly-visible preferential treatment, including a Marshal's escort and preferred seating for Hindu Indian government officials, while members of the Sikh community were relegated to public seating. Most significant, the prosecutor's daily secret reports to the court of the 'threats' and other 'intelligence' information wholly corrupted the entire atmosphere of the hearing; respondents were treated as and made to appear as 'terrorists' so dangerous that only the most extreme security could insure that they or others acting with them would not endanger the participants in the case. [Respondents' Memorandum of Law at 1–2 (footnote omitted)].

The Court has considered defendants' moving papers, together with the Memorandum of Law in Opposition to Respondents' Motion for Discovery and the Memorandum in Reply to Government's Memorandum in Opposition. The Court has also considered the letter brief submitted by Gerald McDowell, Chief of the Public Integrity Section, Criminal Division, Department of Justice, dated June 28, 1988. Oral argument was conducted on July 6, 1988.

## DISCUSSION

### I. SUBJECT MATTER JURISDICTION

This Court had subject matter jurisdiction over these extradition proceedings. Opinion filed February 17, 1988 at 2. The first question presented is whether the Court retains jurisdiction to address the pending motions after issuance of the Certifications. This question should be addressed in the context of "finality" of the Certifications.

In *Eain v. Wilkes*, 641 F.2d 504 (7th Cir.), *cert. denied*, 454 U.S. 894, 102 S.Ct. 390, 70 L.Ed.2d 208 (1981), the court reviewed the procedure for extradition:

Under [18 U.S.C.] § 3184, should the magistrate either determine that the offense charged is not within a treaty's terms or find an absence of probable cause, the magistrate cannot certify the matter to the Secretary of State for extradition. If the case *is* certified to the Secretary for completion of the extradition process it is in the Secretary's sole discretion to determine whether or not extradition should proceed further with the issuance of a warrant of surrender....

The government cannot take a direct appeal from the magistrate's decision *not* to certify the case. There also is no statutory provision for direct appeal of an adverse ruling by a person whose extradition is sought. Instead, that person must seek a writ of habeas corpus..... The scope of habeas corpus review in extradition cases is a limited one, according due deference to the magistrate's initial determination.... The district judge is not to retry the magistrate's case. [641 F.2d at 508 (emphasis in original) (citations omitted)].

*Accord United States v. Doherty*, 786 F.2d 491, 494–95 (2d Cir.1986); *Quinn v. Robinson*, 783 F.2d 776, 786 n. 3 (9th Cir.), *cert. denied*, 479 U.S. 882, 107 S.Ct. 271, 93 L.Ed.2d 247 (1986); *In re Mackin*, 668 F.2d 122, 125–30 (2d Cir.1981); *Hooker v. Klein*, 573 F.2d 1360, 1364–65 (9th Cir.), *cert. denied*, 439 U.S. 932, 99 S.Ct. 323, 58 L.Ed.2d 327 (1978). Thus,

where the government in good faith determines that extradition is warranted, it is not barred from pursuing multiple extradition requests irrespective of whether earlier requests were denied on the merits or on procedural grounds. [*Hooker v. Klein, supra,* 573 F.2d at 1366].

The Certifications are not final. *In re Mackin, supra,* 668 F.2d at 129–30; *Hooker v. Klein, supra,* 573 F.2d at 1367–68. The Court is satisfied that it retains jurisdiction to reopen the proceedings on a

showing of good cause. *Cf. Immigration and Naturalization Service v. Abudu*, 485 U.S. 94, 108 S.Ct. 904, 914, 99 L.Ed.2d 90 (1988) ("appropriate analogy [to motion to reopen deportation proceeding] is a motion for a new trial in a criminal case on the basis of newly discovered evidence, as to which the courts have uniformly held that the moving party bears a heavy burden").[1]

■ Good cause exists here. The evidence of wrongdoing by the prosecutor, intentional or not, is overwhelming. Moreover, "the United States government must, in carrying out its treaty obligations, conform its conduct to the requirements of the Constitution, and ... treaty obligations cannot justify otherwise unconstitutional governmental conduct." *Plaster v. United States*, 720 F.2d 340, 348 (4th Cir.1983); *see Rosado v. Civiletti*, 621 F.2d 1179, 1195 (2d Cir.), *cert. denied*, 449 U.S. 856, 101 S.Ct. 153, 66 L.Ed.2d 70 (1980). The evidence is sufficient to warrant consideration of the pending motions.

This conclusion is consistent with judicial power, on *habeas* review of an extradition order, to enforce the constitutional rights of a defendant. *See Plaster v. United States, supra*, 720 F.2d at 349; *David v. Attorney General*, 699 F.2d 411, 413–15 (7th Cir.), *cert. denied*, 464 U.S. 832, 104 S.Ct. 113, 78 L.Ed.2d 114 (1983). Assuming such judicial power to exist, there is no basis to deny that power to this Court after issuance of the Certifications.[2]

The Court will proceed to the merits. The Court will first address discovery surrounding the prosecutor's known misconduct. The Court will then address discovery of possible prehearing misconduct.

## II. THE EFFECT OF THE PROSECUTOR'S KNOWN MISCONDUCT

### A. *Prosecutorial Misconduct.*

In *United States v. Martino*, 825 F.2d 754 (3d Cir.1987), the Third Circuit Court of Appeals recognized that,

[i]n dealing with alleged improper conduct of prosecutors which is not challenged under statutes directed to the particular conduct ... or case precedent disproving that particular conduct ... the courts have analyzed the challenged conduct either under the rubric of prosecutorial misconduct ... or outrageous government conduct establishing a due process offense .... [825 F.2d at 757].

Moreover,

[n]o case attempts to define the parameters of prosecutorial misconduct. The law is clear, at least in this circuit, that prosecutorial misconduct encompasses at a minimum improper conduct by a prosecutor both at trial ... and in connection with grand jury proceedings. [825 F.2d at 758–59].

Trial conduct is at issue here.

Two comments are called for before continuing. First, no specific guarantee of the Bill of Rights is involved. Instead, defendants contend that the prosecutor's misconduct "infected" the hearings with unfairness. That contention requires an examination of the entire record. *Donnelly v. DeChristoforo*, 416 U.S. 637, 643, 94 S.Ct. 1868, 1871, 40 L.Ed.2d 431 (1974). "The possible prejudicial effect of alleged misconduct must be judged in the context of

---

1. Although it might appear to be inconsistent with the lack of finality, a good cause requirement is appropriate both to give some measure of repose to extradition rulings and to deter meritless applications to reopen made for purposes of delay.

2. Defendants have initiated *habeas* proceedings in the United States District Court for the Southern District of New York. *Gill v. Imundi*, 88 Civ. 1530 (RWS). The respondent is the United States Marshal for the Southern District of New York.

Defendants were remanded to the custody of the United States Marshal for the District of New Jersey. Hearing Transcript ("Hearing Tr.") 379, 1.19 to 1.20, 507, 1.17 to 1.19. Defendants are being detained at the Metropolitan Correctional Center in New York City, the primary purpose of which is to house detainees pending trial in the Southern and Eastern Districts of New York and the District of New Jersey. *Bell v. Wolfish*, 441 U.S. 520, 524, 99 S.Ct. 1861, 1866, 60 L.Ed.2d 447 (1979).

the entire trial." *United States v. McWilliams*, 730 F.2d 1218, 1222 (9th Cir.1984).

Second, defendants focus on the culpability of the prosecutor. However, "the touchstone of due process analysis in cases of alleged prosecutorial misconduct is the fairness of the trial, not the culpability of the prosecutor." *Smith v. Phillips*, 455 U.S. 209, 219, 102 S.Ct. 940, 947, 71 L.Ed.2d 78 (1982). Due process review is intended to

ensure that alleged improper prosecutorial argument does not warp the factfinding function of the jury by deflecting its attention away from consideration of evidence presented at trial .... The essence of due process is fundamental fairness. The Constitution guarantees a fair trial, not a perfect one. [*United States ex rel. Crist v. Lane*, 745 F.2d 476, 482 (7th Cir.), *cert. denied*, 471 U.S. 1068, 105 S.Ct. 2146, 85 L.Ed.2d 503 (1984)].

Since the focus of the Court's consideration must be on the fairness of the hearings and not the prosecutor's culpability, defendants are not entitled to discovery to determine "why the prosecutor did what she did." Argument Transcript ("Argument Tr.") 11, 1.5 to 1.11.

Moreover, and inasmuch as the effect of the misconduct must be determined from a review of the record, defendants are entitled to no discovery surrounding the hearings. For that matter, defendants are entitled to no relief absent a showing of prejudice. *See, e.g., Bank of Nova Scotia v. United States*, —— U.S. ——, ——, 108 S.Ct. 2369, 2372–76, 101 L.Ed.2d 228 (1988); *United States v. Mechanik*, 475 U.S. 66, 71–72, 106 S.Ct. 938, 942–43, 89 L.Ed.2d 50 (1986); *United States v. Hasting*, 461 U.S. 499, 504–09, 103 S.Ct. 1974, 1977–81, 76 L.Ed.2d 96 (1983); *Smith v. Phillips*, *supra*, 455 U.S. at 218–21 & n. 10, 102 S.Ct. at 946–48 & n. 10; *United States v. Morrison*, 449 U.S. 361, 364–67, 101 S.Ct. 665, 667–69, 66 L.Ed.2d 564 (1981); *United States v. Martino*, *supra*, 825 F.2d at 759. Absent such a showing there is no basis or need for discovery in any event.

In *United States v. Hasting*, *supra*, the Supreme Court reviewed "the reversal of respondent's convictions because of prosecutorial allusion to their failure to rebut the Government's evidence." 461 U.S. at 500, 103 S.Ct. at 1976. In reversing the court of appeals, the Supreme Court limited the exercise of supervisory power:

'[G]uided by considerations of justice,' *McNabb v. United States*, 318 U.S. 332, 341 [63 S.Ct. 608, 613, 87 L.Ed. 819] (1943), and in the exercise of supervisory powers, federal courts may, within limits, formulate procedural rules not specifically required by the Constitution or the Congress. The purposes underlying use of the supervisory powers are threefold: to implement a remedy for violation of recognized rights, *McNabb, supra*, at 340 [63 S.Ct. at 612]; *Rea v. United States*, 350 U.S. 214, 217 [76 S.Ct. 292, 294, 100 L.Ed. 233] (1956); to preserve judicial integrity by ensuring that a conviction rests on appropriate considerations validly before the jury, *McNabb, supra* [318 U.S.] at 345 [63 S.Ct. at 615]; *Elkins v. United States*, 364 U.S. 206, 222 [80 S.Ct. 1437, 1446, 4 L.Ed.2d 1669] (1960); and finally, as a remedy designed to deter illegal conduct, *United States v. Payner*, 447 U.S. 727, 735–736, n. 8 [100 S.Ct. 2439, 2446–2447, n. 8, 65 L.Ed.2d 468] (1980).

The goals that are implicated by supervisory powers are not however, significant in the context of this case if, as the Court of Appeals plainly implied, the errors alleged are harmless. *Supervisory power to reverse a conviction is not needed as a remedy when the error to which it is addressed is harmless since, by definition, the conviction would have been obtained notwithstanding the asserted error.* Further, in this context, the integrity of the process carries less weight, for it is the essence of the harmless-error doctrine that a judgment may stand only when there is no 'reasonable possibility that the [practice] complained of might have contributed to the conviction.' *Fahy v. Connecticut*, 375 U.S. 85, 86–87 [84 S.Ct. 229, 230, 11 L.Ed.2d 171] (1963). Finally, deterrence is an inappropriate basis for reversal where, as here, the prosecutor's remark is at most an

attenuated violation of *Griffin* and where means more narrowly tailored to deter objectionable prosecutorial conduct are available. [461 U.S. at 505–06, 103 S.Ct. at 1978 (emphasis added)].

Similarly, in *United States v. Morrison, supra,* the Supreme Court discussed remedies for constitutional violations:

At the same time and without detracting from the fundamental importance of the right to counsel in criminal cases, we have implicitly recognized the necessity for preserving society's interest in the administration of criminal justice. Cases involving Sixth Amendment deprivations are subject to the general rule that *remedies should be tailored to the injury suffered from the constitutional violation and should not unnecessarily infringe on competing interests.* Our relevant cases reflect this approach. In *Gideon v. Wainwright, supra* [372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799 (1963)], the defendant was totally denied the assistance of counsel at his criminal trial. In *Geders v. United States, supra* [425 U.S. 80, 96 S.Ct. 1330, 47 L.Ed.2d 592 (1976)], *Herring v. New York, supra* [422 U.S. 853, 95 S.Ct. 2550, 45 L.Ed.2d 593 (1975)]; and *Powell v. Alabama,* 287 U.S. 45 [53 S.Ct. 55, 77 L.Ed. 158] (1932), judicial action before or during trial prevented counsel from being fully effective. In *Black v. United States,* 385 U.S. 26 [87 S.Ct. 190, 17 L.Ed.2d 26] (1966), and *O'Brien v. United States,* 386 U.S. 345 [87 S.Ct. 1158, 18 L.Ed.2d 94] (1967), law enforcement officers improperly overheard pretrial conversations between a defendant and his lawyer. None of these deprivations, however, resulted in the dismissal of the indictment. Rather, the conviction in each case was reversed and the Government was free to proceed with a new trial. Similarly, when before trial but after the institution of adversary proceedings, the prosecution has improperly obtained incriminating information from the defendant in the absence of his counsel, the *remedy characteristically imposed is not to dismiss the indictment but to suppress the evidence or to order a new trial if the evidence has been wrongfully admitted and the defendant convicted.* Gilbert v. California, supra [388 U.S. 263, 87 S.Ct. 1951, 18 L.Ed.2d 1178 (1967)]; *United States v. Wade, supra* [388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967)]; *Massiah v. United States, supra* [377 U.S. 201, 84 S.Ct. 1199, 12 L.Ed.2d 246 (1964)]. In addition, certain violations of the right to counsel may be disregarded as harmless error. Compare *Moore v. Illinois, supra* [434 U.S. 220], at 232 [98 S.Ct. 458, at 466, 54 L.Ed.2d 424 (1977)], with *Chapman v. California,* 386 U.S. 18, 23, and n. 8 [87 S.Ct. 824, 827, and n. 8, 17 L.Ed.2d 705] (1967).

Our approach has thus been to identify and then neutralize the taint by tailoring relief appropriate in the circumstances to assure the defendant the effective assistance of counsel and a fair trial. The premise of our prior cases is that the constitutional infringement identified has had or threatens some adverse effect upon the effectiveness of counsel's representation or has produced some other prejudice to the defense. Absent such impact on the criminal proceeding, however, there is no basis for imposing a remedy in that proceeding, which can go forward with full recognition of the defendant's right to counsel and to a fair trial. [449 U.S. at 364–65, 101 S.Ct. at 667–68 (emphasis added)].

Consistent with the above,

[o]nce a court determines that there has been prosecutorial misconduct ... it must then determine whether any sanction ... is appropriate. The Supreme Court has held [in *Hasting* ] that a court may not exercise its supervisory power to discipline the prosecutor or warn other prosecutors without considering whether the defendant's rights were adversely affected. [*United States v. Martino, supra,* 825 F.2d at 759].

■ Plainly, "means more narrowly tailored to deter objectional prosecutorial conduct are available." *United States v. Hasting, supra,* 461 U.S. at 506, 103 S.Ct. at 1979. The prosecutor is the subject of an ongoing criminal investigation. Argument

Tr. 30, 1.25 to 31, 1.2. She is also subject to disciplinary proceedings. *See* General Rule 7. The only basis for the exercise of supervisory power would be to cure prejudice.[3]

■ Defendants contend that the hearings were infected with unfairness. During the hearings defendants asked the Court to recuse itself. The grounds for this request were (1) the receipt of a threat by the Court, (2) the attitude of the Court toward defense counsel and (3) the "indication" that the security measures imposed constituted a prejudgment on the merits by the Court. Hearing Tr. 6, 1.3 to 11, 1.5; Transcript of February 1, 1988 *habeas* proceeding ("*Habeas* Tr.") 3, 1.5 to 5, 1.21, 11, 1.1 to 1.18. Defendants also contend that the *ex parte* communications between the Court and the prosecutor tainted the hearings. These allegations point to the only possible prejudice suffered by defendants

as a result of the prosecutor's known misconduct: adjudication by a biased judicial officer. The Court will address these allegations *seriatum*.[4]

B. *Bias.*

28 U.S.C. § 455 provides, in pertinent part:

(a) Any ... magistrate of the United States shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned.

(b) He shall also disqualify himself in the following circumstances:

(1) Where he has a personal bias or prejudice concerning a party....

Recusal must be considered here under Sections 455(a) and (b)(1).[5]

In *United States v. Nobel*, 696 F.2d 231 (3d Cir.1982), *cert. denied*, 462 U.S. 1118,

---

**3.** The Court acknowledges a line of decisions which uphold an extreme sanction (such as dismissal of an indictment) "to deter a pattern of demonstrated and longstanding or continuous official misconduct." *United States v. Broward*, 594 F.2d 345, 351 (2d Cir.), *cert. denied*, 442 U.S. 941, 99 S.Ct. 2882, 61 L.Ed.2d 310 (1979). Assuming these decisions to have continued validity in light of *Hasting*, the Court is unaware of any decision which holds that prosecutorial misconduct in one matter (even assuming as defendants do that the prosecutor's misconduct *may* have been continuous) constitutes a "pattern." *Compare United States v. Broward, supra*, 594 F.2d at 351 (declining exercise of supervisory power to dismiss indictment despite insertion of false material in affidavits in case; "simply no need to thwart the public interest in prosecuting serious crimes unless the government conduct is widespread or extraordinarily serious") *with United States v. Jacobs*, 547 F.2d 772, 778 (2d Cir.1976) (supervisory power exercised to strike defendant's grand jury testimony to ensure that Strike Force attorneys follow uniform practice of United States Attorneys of warning potential defendants that they are targets of investigation; "[w]e have commented *in camera* from time to time on the failure of certain special attorneys to avail themselves" of knowledge of United States Attorneys) *and United States v. Estepa*, 471 F.2d 1132, 1137 (2d Cir.1972) (supervisory power exercised to dismiss indictment given prosecutors' continued failure over years to heed "clear warnings" to avoid undue reliance on hearsay before grand jury).

Absent a pattern of demonstrated and continuous official misconduct in extradition cases

(either by the United States Government or the Government of India)—and no such pattern has been demonstrated here—there is no basis to allow the discovery into some speculative official participation in, or knowledge of, the prosecutor's known misconduct.

**4.** The need to show prejudice "presupposes a trial, at which the defendant, represented by counsel, may present evidence and argument before an impartial judge...." Adjudication by a biased judge would "necessarily render a trial fundamentally unfair." *Rose v. Clark*, 478 U.S. 570, 577–78, 106 S.Ct. 3101, 3105–06, 92 L.Ed.2d 460 (1986). Should defendants be correct as to the bias of the Court, no specific showing of prejudice would be necessary. "The nature of the violation allow[s] a presumption that the defendant was prejudiced, and any inquiry into harmless error would have required unguided speculation." *Bank of Nova Scotia v. United States, supra*, —— U.S. at ——, 108 S.Ct. at 2375. Therefore, the Court need not consider the appropriate standard of proof of prejudice which would be applicable.

**5.** The right to an unbiased judge derives from the Due Process Clause. *In re Murchison*, 349 U.S. 133, 136, 75 S.Ct. 623, 625, 99 L.Ed. 942 (1955). However, since anything impinging on that right "would have more readily violated § 144 or § 455," the Court need not consider any constitutional implications. *United States v. Haldeman*, 559 F.2d 31, 130 n. 276 (D.C.Cir. 1976), *cert. denied*, 431 U.S. 933, 97 S.Ct. 2641, 53 L.Ed.2d 250 (1977); *accord In re International Business Machines Corp.*, 618 F.2d 923, 932 n. 11 (2d Cir.1980).

103 S.Ct. 3086, 77 L.Ed.2d 1348 (1983), the Third Circuit Court of Appeals held that,

> [s]ubsection (a) of section 455 sets out the general policy of disqualification 'in any proceeding in which [the judge's] impartiality might reasonably be questioned.' The general language of this subsection is particularized in subsection (b) which enumerates specific disqualification standards which were designed to 'eliminate the uncertainty and ambiguity arising from the language in the [prior] statute.' House Report at 5–6, *reprinted in* 1974 U.S.Code Cong. & Ad.News at 6355. [696 F.2d at 233–34].

"[S]ection (b)(1) simply provides a specific example of a situation in which a judge's 'impartiality might reasonably be questioned' pursuant to section 455(a)." *United States v. Sibla*, 624 F.2d 864, 867 (9th Cir.1980). The substantive standard under Sections 455(a) and (b)(1) are the same. *United States v. Sibla, supra*, 624 F.2d at 867.[6]

"Our Court has interpreted subsection (a) to mean that 'a judge should recuse himself where a reasonable man knowing all the circumstances would harbor doubts concerning the judge's impartiality.'" *United States v. Sciarra*, 851 F.2d 621, 634 (3d Cir.1988) (*quoting United States v. Dalfonso*, 707 F.2d 757, 760 (3d Cir.1983)). Only extrajudicial bias requires disqualification. *United States v. Sciarra, supra*, at 634; *Johnson v. Trueblood*, 629 F.2d 287, 290–91 (3d Cir.1980), *cert. denied*, 450 U.S. 999, 101 S.Ct. 1704, 68 L.Ed.2d 200 (1981). " 'Extrajudicial bias' refers to a bias that is not derived from the evidence or conduct of the parties that the judge observes in the course of the proceedings." *Johnson v. Trueblood, supra*, 629 F.2d at 291.

"The focus under [Section 455(a) ] is on the objective appearance of bias, rather than bias-in-fact." *United States v. Nobel, supra*, 696 F.2d at 235; *accord Liljeberg v. Health Services Acquisition Corp.*, —— U.S. ——, —— n. 7, 108 S.Ct. 2194, 2201 n. 7, 100 L.Ed.2d 855 (1988). "Normally the judge's rulings at trial do not constitute grounds for recusal because they can be corrected by reversal on appeal." *Johnson v. Trueblood, supra*, 629 F.2d at 291; *accord United States v. Wilensky*, 757 F.2d 594, 598 (3d Cir.1985); *In re International Business Machines Corp.*, 618 F.2d 923, 929 (2d Cir.1980).

Again, one comment is in order. This derives from the legislative history of Section 455:

> While the proposed legislation would remove the 'duty to sit' concept of present law, a cautionary note is in order. *No judge, of course, has a duty to sit where his impartiality might be reasonably questioned. However, the new test should not be used by judges to avoid sitting on difficult or controversial cases.*
>
> At the same time, in assessing the reasonableness of a challenge to his impartiality, each judge must be alert to avoid the possibility that those who would question his impartiality are in fact seeking to avoid the consequences of his expected adverse decision. Disqualification for lack of impartiality must have a *reasonable* basis. *Nothing in this proposed legislation should be read to warrant the transformation of a litigant's fear that a judge may decide a question against him into a 'reasonable fear' that the judge will not be impartial.* Litigants ought not have to face a judge where there is a reasonable question of impartiality, but they are not entitled to judges of their own choice. [H.R. Rep. No. 93–1453, 93d Cong., 2d Sess., *reprinted in 1974 U.S.Code Cong. & Admin.News* 6351, 6355].

*See Wolfson v. Palmieri*, 396 F.2d 121, 124 (2d Cir.1968) (*per curiam* ).

With the foregoing in mind, the Court will address defendants' allegations.

---

**6.** The Supreme Court held recently that "Section 455(b) is ... a somewhat stricter provision [than Section 455(a) ], and thus is not simply redundant with the broader coverage of § 455(a)...." *Liljeberg v. Health Services Acquisition Corp.*, —— U.S. ——, —— n. 8, 108 S.Ct. 2194, 2202 n. 8, 100 L.Ed.2d 855 (1988). Despite this holding the same substantive standard appears to apply to both sections under the facts *sub judice.*

■ *Receipt of a Threat.* The Court received one letter which might be construed as a threat. There was no evidence that the letter had been authored by or on behalf of either defendant. Hearing Tr. 10, 1.19 to 1.24, 179, 1.2 to 1.25, 181, 1.2 to 183, 1.5. Even assuming the letter to have been a threat, it was not a basis for recusal.

In *United States v. Dalfonso,* 707 F.2d 757 (3d Cir.1983), the defendant appealed from the failure of the trial judge to recuse himself. In affirming the defendant's conviction the Third Circuit held that,

the trial judge had no reason to, nor is there any evidence that he did, hold Dalfonso responsible for the incident. Third, there is nothing in this record to warrant the fear that the judge had become so emotionally involved by the disclosures of possible efforts to corrupt that his ability to preside impartially might reasonably be questioned....

[I]mportant considerations weighed against recusal. When the trial judge refused to recuse because of his concern that the recusal, under the circumstances, might set an undesirable precedent, he may have recognized the temptation that such a procedure offered to defendants ready to seize upon any opportunity to avoid trial before a particular judge. An anonymous telephone call to the FBI or to the judge himself, or a telephone call to the prosecuting attorney by an imposter falsely claiming that an effort was being made to influence or even corrupt the trial judge, might open avenues for judge shopping by impelling the trial judge to recuse. We cannot reasonably call into question the impartiality of a presiding judge upon so tenuous a basis as a telephone call, made by a meddler or even an accused, suggesting that the judge might succumb to improper inducements.

This potential judge shopping problem was not lost upon the framers of the federal recusal statute.... There is no reasonable basis in this record to question the judge's impartiality. A decision to recuse in the instant case might encourage false impugnment of the integrity of trial judges as a tactic in future cases. [707 F.2d at 760–61 (footnote omitted)].

*See United States v. Hillsberg,* 812 F.2d 328, 335 (7th Cir.), *cert. denied,* 481 U.S. 1041, 107 S.Ct. 1981, 95 L.Ed.2d 821 (1987) (judge's receipt of letter from defendant's mother no basis for recusal; letter received in judicial capacity and "[i]t would be unreasonable to conclude that the fact that a defendant's mother writes to the judge asking for mercy makes the judge partial. Were Hillsberg's argument accepted, any defendant who wished a change of judge would require no more than a note from his mother"); *Ronwin v. State Bar of Arizona,* 686 F.2d 692, 700–01 (9th Cir.1981), *cert. denied,* 461 U.S. 938, 103 S.Ct. 2110, 77 L.Ed.2d 314 (1983) (that presiding judge named as defendant in separate action by plaintiff no basis for recusal; "[s]uch an easy method for obtaining disqualification should not be encouraged or allowed").

The receipt of a threat did not justify recusal. Recusal would only encourage litigants to send threats in the hope of forcing recusal and obtaining a different judge.[7]

*Friction with Defense Counsel.* At the commencement of the hearings counsel for defendant Singh engaged in a heated exchange with the Court. Hearing Tr. 3, 1.8 to 6, 1.7. On the basis of that exchange defendants sought recusal.

■ Sections 455(a) and (b)(1) require recusal only if bias or prejudice is directed *against a party. United States v. Sibla, supra,* 624 F.2d at 869. "The term 'party' ... does not include counsel as such.... Antipathy to an attorney is insufficient grounds for disqualification of a judge because it is not indicative of extrajudicial bias against a 'party'." *Gilbert v. City of*

---

7. Unique circumstances surrounding a threat might warrant recusal. *See United States v. Cerrella,* 529 F.Supp. 1373, 1374, 1380–81 (S.D. Fla.1982) (recusal justified when defendant expressed intention to murder judge, let murder contract, and persisted in plans despite investigation).

*Little Rock,* 722 F.2d 1390, 1398 (8th Cir. 1983), *cert. denied,* 466 U.S. 972, 104 S.Ct. 2347, 80 L.Ed.2d 820 (1984).

That there was friction between the Court and defendant Singh's counsel cannot be doubted. That in itself was not a basis for recusal. Absent some showing of personal bias or prejudice against the defendants recusal was not warranted. *Gilbert v. City of Little Rock, supra,* 722 F.2d at 1399; *Plaquemines Parish School Board v. United States,* 415 F.2d 817, 824–25 (5th Cir.1969).[8]

■ *Ex Parte Communications. Ex parte* communications are not unconstitutional *per se. United States v. Adams,* 785 F.2d 917, 920 (11th Cir.1986); *LaChappelle v. Moran,* 699 F.2d 560, 566 (1st Cir.1983). The Court followed procedures to ensure that the *ex parte* communications were fair. First, at no time were the merits discussed. Second, the communications were transcribed. *See United States v. Adams, supra,* 785 F.2d at 920; *United States v. Walsh,* 700 F.2d 846, 858 (2d Cir.), *cert. denied,* 464 U.S. 825, 104 S.Ct. 96, 78 L.Ed.2d 102 (1983). As with prosecutorial misconduct, the touchstone remains prejudice to defendants. *See United States v. Napue,* 834 F.2d 1311, 1323 (7th Cir.1987); *United States v. Adams, supra,* 785 F.2d at 921; *United States v. Earley,* 746 F.2d 412, 417 (8th Cir.1984), *cert. denied,* 472 U.S. 1010, 105 S.Ct. 2707, 86 L.Ed.2d 723 (1985); *United States v. Walsh, supra,* 700 F.2d at 858; *LaChappelle v. Moran, supra,* 699 F.2d at 566–67. Defendants could have been prejudiced only if the *ex parte* communications biased the Court.

■ The *ex parte* communications were not extrajudicial. Accordingly, the communications did not constitute a basis for recusal. *United States v. Meester,* 762 F.2d 867, 884–85 (11th Cir.), *cert. denied,* 474 U.S. 1024, 106 S.Ct. 579, 88 L.Ed.2d 562 (1985); *United States v. Phillips,* 664 F.2d 971, 1000–03 (5th Cir.1981), *cert. denied,* 457 U.S. 1136, 102 S.Ct. 2965, 73 L.Ed.2d 1354 (1982); *United States v. Johnson,* 658 F.2d 1176, 1178–79 (7th Cir.1981); *United*

*States v. Haldeman,* 559 F.2d 31, 133 n. 301 (D.C.Cir.1976), *cert. denied,* 431 U.S. 933, 97 S.Ct. 2641, 53 L.Ed.2d 250 (1977).

In *United States v. Phillips, supra,* the appellants challenged the trial judge's participation in *ex parte* proceedings with government attorneys. "[T]he judge was kept informed about a collateral government investigation into alleged plan of certain defendants to disrupt the trial...." 664 F.2d at 1000. In affirming the appellants' convictions the Fifth Circuit stated:

Appellants contend that the trial judge allowed his partiality to be seriously questioned by receiving, in ex parte meetings with government attorneys, information concerning the government's collateral investigation of the alleged plots to disrupt the trial and, further, by sanctioning and participating in those investigations. Appellants maintain that, as a result of the trial judge's involvement in the investigation, an involvement which they claim demonstrated the judge's commingling of judicial and prosecutorial roles, the judge should have recused himself.

Appellants also charge that recusal of the trial judge was required because several of his comments from the bench demonstrated his bias and prejudice against the defendants. The judge, outside the presence of the jury, made several references to threats against his life and to the thorough security measures that were taken to protect him....

It is well settled that under either Section 144 or Section 455 an allegation of bias sufficient to require disqualification must demonstrate that the bias is personal as distinguished from judicial in nature. *The alleged bias and prejudice, in order to be personal and therefore disqualifying, 'must stem from an extrajudicial source and result in an opinion on the merits on some basis other than what the judge learned from his participation in the case.' United States v. Grinnell Corp.,* 384 U.S. 563, 583, 86 S.Ct. 1698, 1710, 16 L.Ed.2d 778 (1966). Thus, a motion for recusal may

---

**8.** The record demonstrates that this was the     only dispute between counsel and the Court.

not ordinarily be predicated upon the judge's rulings in the same or a related case. *An exception to the general rule that the disqualifying bias must stem from extrajudicial sources is the situation in which 'such pervasive bias and prejudice is shown by otherwise judicial conduct as would constitute bias against a party.'* Davis v. Board of School Comm'rs, supra, 517 F.2d [1044] at 1051 [ (5th Cir.1975) ].

Appellants contend that the trial judge was improperly involved in the collateral investigation of the alleged plans to disrupt the trial. We conclude that the judge did not act improperly. The Strike Force attorneys contacted the trial judge in his capacity as presiding judge in those proceedings and the *ex parte* revelations made by those attorneys were made for two indisputably proper purposes. *First, the information conveyed by the attorneys concerning plans by several defendants to disrupt the proceedings was necessary in order to enable the judge to perform his continuing duty to conduct an orderly trial and to take appropriate measures designed to protect the participants therein.* Second, the information concerning the plans of certain defendants to flee from the country was highly relevant to the court's determination on bond revocation....

The trial court in this case was not impermissibly involved in the government's investigation. Although the court was advised that such an investigation was being undertaken, it did not direct the investigation. Government investigations of possible efforts by criminal defendants to disrupt the judicial proceedings are proper. [664 F.2d at 1001–03 (emphasis added) (footnotes omitted) ].

In *United States v. Johnson, supra,* the Seventh Circuit rejected the argument that *in camera* review of documents warranted recusal:

Those allegations of bias and prejudice which are of a more factual nature are nonetheless insufficient to support a recusal motion. The crux of Johnson's motion for recusal was that the district court had been exposed to statements contained in *in camera* documents which the government submitted to the district court. These alleged prejudicial statements apparently related to threats made by Johnson to Sylvia Moore, the government informant.

In resolving this issue we are guided by the principle that the bias or prejudice must arise from an extrajudicial source and not merely from the judge's participation in the case. *United States v. English,* 501 F.2d 1254, 1263 (7th Cir. 1974), *cert. denied sub nom. Hubbard v. United States,* 419 U.S. 1114, 95 S.Ct. 791, 42 L.Ed.2d 811 (1975). As noted above, the only arguable extrajudicial source would be the documents submitted *in camera.*

Apparently Johnson's contention is that the material contained in the *in camera* submission is *ex parte* material not evidentiary in nature and thus is extrajudicial in nature. We disagree and conclude that information obtained through *in camera* submissions are not 'extrajudicial'....

Similarly, in this case the information brought to the attention of the district judge was during the performance of his judicial duties. It being clear that the information in no way caused the district court to be biased or prejudge the case, the motion to recuse was properly denied. [658 F.2d at 1178–79 (emphasis added) (footnotes omitted) ].

The *ex parte* communications were not extrajudicial. Recusal would have been appropriate only if the record demonstrated bias in fact or justified "a rarely invoked exception ... that requires disqualification when a judge displays 'pervasive bias' towards defendants regardless of the source of the bias." *United States v. Rosenberg,* 806 F.2d 1169, 1174 (3d Cir.1986), *cert. denied,* 481 U.S. 1070, 107 S.Ct. 2465, 95 L.Ed.2d 873 (1987); *see, e.g., United States v. Kelley,* 712 F.2d 884, 890 (1st Cir.1983).

■ The only "manifestation" of bias offered by defendants is the extraordinary security measures which surrounded the

hearings. More particularly, defendants complain of having been chained and shackled and forced to appear in prison garb.[9]

The Supreme Court last addressed extraordinary security measures in *Holbrook v. Flynn*, 475 U.S. 560, 106 S.Ct. 1340, 89 L.Ed.2d 525 (1986): The Supreme Court stated:

> Recognizing that jurors are quite aware that the defendant appearing before them did not arrive there by choice or happenstance, we have never tried, and could never hope, to eliminate from trial procedures every reminder that the State has chosen to marshal its resources against a defendant to punish him for allegedly criminal conduct. To guarantee a defendant's due process rights under ordinary circumstances, our legal system has instead placed primary reliance on the adversary system and the presumption of innocence. When defense counsel vigorously represents his client's interests and the trial judge assiduously works to impress jurors with the need to presume the defendant's innocence, we have trusted that a fair result can be obtained.
>
> Our faith in the adversary system and in jurors' capacity to adhere to the trial judge's instructions has never been absolute, however. We have recognized that certain practices pose such a threat to the 'fairness of the fact-finding process' that they must be subjected to 'close judicial scrutiny.' *Estelle v. Williams*, 425 U.S. 501, 503–504 [96 S.Ct. 1691, 1692–1693, 48 L.Ed.2d 126] (1976). Thus, in *Estelle v. Williams*, we noted that where a defendant is forced to wear prison clothes when appearing before the jury, 'the constant reminder of the accused's condition implicit in such distinc-

tive, identifiable attire may affect a juror's judgment.' *Id.*, at 504–505 [96 S.Ct., at 1693]. Since no 'essential state policy' is served by compelling a defendant to dress in this manner, *id.*, at 505 [96 S.Ct., at 1693], this Court went no further and concluded that the practice is unconstitutional. This close scrutiny of inherently prejudicial practices has not always been fatal, however. In *Illinois v. Allen*, 397 U.S. 337 [90 S.Ct. 1057, 25 L.Ed.2d 353] (1970), the court emphasized that a defendant may be prejudiced if he appears before the jury bound and gagged. 'Not only is it possible that the sight of shackles and gags might have a significant effect on the jury's feelings about the defendant, but the use of this technique is itself something of an affront to the very dignity and decorum of judicial proceedings that the judge is seeking to uphold.' *Id.*, at 344 [90 S.Ct., at 1061]. Yet the Court nonetheless observed that in certain extreme situations, 'binding and gagging might possibly be the fairest and most reasonable way to handle' a particularly obstreperous and disruptive defendant. *Ibid.* [475 U.S. at 567–68, 106 S.Ct. at 1345–46].

*Holbrook* makes clear that the focus of any inquiry must be on the effect of extraordinary security measures on a jury:

> If 'a procedure employed by the State involves such a probability that prejudice will result that it is deemed inherently lacking in due process,' *Estes v. Texas*, 381 U.S. 532, 542–543 [85 S.Ct. 1628, 1632–1633, 14 L.Ed.2d 543] (1965), little stock need be placed in jurors' claims to the contrary. *See Sheppard v. Maxwell*, 384 U.S. 333, 351–352 [86 S.Ct. 1507, 1516–1517, 16 L.Ed.2d 600] (1966); *Irvin v. Dowd*, 366 U.S. 717, 728 [81 S.Ct. 1639,

---

**9.** The prison garb is of no significance. In *Estelle v. Williams*, 425 U.S. 501, 96 S.Ct. 1691, 48 L.Ed.2d 126 (1976), the Supreme Court held that, "the State cannot, consistently with the Fourteenth Amendment, compel an accused to stand trial before a jury while dressed in identifiable prison clothes ..." 425 U.S. at 512, 96 S.Ct. at 1697. However, the Supreme Court also recognized that, " '[n]o prejudice can result from seeing that which is already known.' " 425 U.S. at 507, 96 S.Ct. at 1694 (*quoting United*

*States ex rel. Stahl v. Henderson*, 472 F.2d 556, 557 (5th Cir.), *cert. denied*, 411 U.S. 971, 93 S.Ct. 2166, 36 L.Ed.2d 694 (1973)). Defendants were denied bail at their initial appearance on May 14, 1987 and were detained at the Metropolitan Correctional Center since that date. These facts were known to the Court and the public. *See Habeas* Tr. 18, 1.23 to 19, 13. Defendants' appearance in prison clothes, as a matter of law, could not have prejudiced them.

1645, 6 L.Ed.2d 751] (1961). Even though a practice may be inherently prejudicial, jurors will not necessarily be fully conscious of the effect it will have on their attitude toward the accused. This will be especially true when jurors are questioned at the very beginning of proceedings; at that point, they can only speculate on how they will feel after being exposed to a practice daily over the course of a long trial. Whenever a courtroom arrangement is challenged as inherently prejudicial, therefore, the question must be not whether jurors actually articulated a consciousness of some prejudicial effect, but rather whether 'an unacceptable risk is presented of impermissible factors coming into play,' *Williams*, 425 U.S., at 505 [96 S.Ct., at 1693]. [475 U.S. at 570, 106 S.Ct. at 1346].

*See Boswell v. State*, 537 F.2d 100, 102–03 n. 7 (5th Cir.1976) ("[c]ases which have considered the right of a handcuffed or shackled accused not to be viewed by potential jurors lend further support to the proposition that the fair trial rights of *a defendant displaying physical indicia of guilt* may be as endangered when he is viewed by the venire as when he is viewed by the jurors at his trial") (emphasis added).

In *United States v. Heldt*, 668 F.2d 1238 (D.C.Cir.1981), *cert. denied*, 456 U.S. 926, 102 S.Ct. 1971, 72 L.Ed.2d 440 (1982), the court of appeals held that the trial judge properly decided not to recuse himself:

> Just prior to sentencing on December 4, 1979, the defendants moved pursuant to section 144 and 455 of Title 28 to recuse the trial judge from the sentencing process. *The principal ground upon which the motion was made was a claim that the trial judge had deceptively concealed from the defendants the cause of the security measures taken during the Los Angeles proceedings....*
>
> * * * * * *

Appellants recognize that disqualification based on prejudice is required only if the alleged prejudice stems from an extrajudicial source. *Because every instance upon which appellants rely to demonstrate the trial judge's bias is either a judicial ruling or some other conduct that occurred during the judge's fulfillment of his judicial duties, we are tempted to reject appellants' argument out of hand.* Recognizing the legal requirement of an extrajudicial source, however, appellants have attempted to create an inference of such fact on the basis of courtroom conduct. They submit first that the security precautions taken during the Los Angeles proceedings were related to the Scientologists. Second, they offer the observation that security precautions are usually invoked based upon fear of bodily harm. Appellants then argue that since there is nothing in the record to support the judge's fear of any of the defendants, that fear must be extrajudicial in origin. The final link in this chain of inference is that a deceptive concealment of the reasons for the security evidences prejudice against the defendants. Thus, from an allegedly deceptive statement made concerning courthouse security, defendants draw conclusions both of prejudice and an extrajudicial source of that prejudice. We are unable to accept either conclusion.

First, defendants do not persuade us that the source of the judge's fear was extrajudicial. We disagree with defendants that the record contains nothing that might cause the judge to fear for his safety, for the safety of government witnesses, or for the orderliness of the proceedings.... [I]t was entirely reasonable to take the security precautions that were taken and we refuse to second-guess the district judge and the Marshal's service in their decision to institute security. Consequently, we are unable to agree with defendants that the basis for institution of security must necessarily have been extrajudicial. Indeed, substantial security measures, only slightly less exacting, have been permanently employed for a considerable period of time at the United States Courthouse in

Washington, D.C. where Judge Richey regularly hears cases.

Further, even if we were to accept all that appellants would have us assume—that the judge misrepresented the facts when he said the security was unrelated to the Scientology case and that the source of the judge's fear could only be extrajudicial—we could not accept appellants' position that this necessarily evidences prejudice against defendants. Scientology's officers and undoubtedly some of its members were highly agitated against the government, as is proved by the widespread organization of the conspiracy and the extreme measures that the conspirators took in an effort to achieve the unlawful objectives. When an organization or its leaders are involved in judicial proceedings, security measures are properly implemented to protect against an overzealous rank and file member of the organization who overreacts to the action taken against his leaders or institution. If the judge had reasonable grounds to fear that appellants or some isolated member of the Church might be carried away by the passion of the moment and take some rash action, he had no obligation to tell them or their counsel that the security was imposed for that reason. Tight security measures, which as stated above are routine in the United States District Courts in the District of Columbia, are, for the most part, irrelevant to the merits of a criminal prosecution, especially in a nonjury suppression hearing. Indeed, the effectiveness of security measures may be diminished if their existence or purpose is disclosed.

The question posed, then, is the relevance to the question of prejudice of a judge's concealment of a fact which has no bearing on the merits of the case. An appellate court cannot approve of judicial deceit, but the ultimate issue faced by this court is the probative value of an alleged deception on the issue of prejudice. Even if it occurred, the concealment, as it is here alleged, is not sufficient to raise the appearance of prejudice in the mind of a reasonable person who is familiar with all the facts. From all the circumstances it appears that a reasonable explanation of the judge's statement is that it was an inartful attempt to tell appellants that the security measures were a matter for the court and the Marshal to determine. The court also may have been motivated to protect the defendants from the damaging publicity that might have resulted from a statement by the court as to their numerous illegal acts as disclosed by the court file. In any event, in our judgment appellants have not carried their burden of establishing the appearance of prejudice.

Our determination that appellants' argument concerning the judge's remarks regarding security is unavailing obviates any extended discussion of the other incidents claimed to evidence prejudice. The elevator incidents and the hallway incidents suggest little if anything about prejudice. The reliance upon a number of rulings made by the judge is clearly misplaced: not only do the rulings appear unexceptionable, they are incapable of supporting a finding of extrajudicial, personal prejudice. [688 F.2d at 1269–74 (emphasis added) (footnotes omitted)].

■ The security measures employed during the hearings should be placed in context. First, there was no jury present. The Court had no concern for jury observation of "indicia of guilt" of defendants. Hearing Tr. 6, 1.18 to 1.23. Second, no information conveyed to the Court went to the merits. Third, although the Court was the finder of fact, the responsibility of the Court extended beyond defendants to the safety and security of all in and around the courtroom.

Defendants were charged with violent crimes, at least several of which appear to have been related to Hindu–Sikh conflict in India. Defendants themselves acknowledged violent Hindu–Sikh conflict in India as well as the emergence of armed organizations dedicated to Sikh independence. Transcript of Initial Appearances at 16, 1.5 to 1.10, 18, 1.6 to 19, 1.3; Paragraphs 51–59, Affirmation of Ronald L. Kuby filed

July 27, 1987.[10] Defendants also acknowledged that, as a religious tenet, Sikhs carry weapons. Hearing Tr. 174, ı.1 to 175, 1.25. It was also apparent that the proceedings had generated considerable publicity here and in India.

All of these circumstances, together with information conveyed to the Court by the prosecutor, see Affidavits of Daniel J. Gibbons filed March 30 and April 13, 1988, led the Court to accede to the security measures imposed.[11] The information before the Court justified the security measures. That information did not implicate defendants. Defendants received the benefit of favorable rulings. Order and Opinion filed January 31, 1988; Hearing Tr. 68, 1.22 to 73, 1.17, 136, 1.2 to 1.21, 166, 1.7 to 167, 1.13, 167, 1.19 to 169, 1.13, 195, 1.5 to 1.17, 212, 1.20 to 215, 1.2, 258, 1.5 to 1.11, 283, 1.14 to 284, 1.7, 457, 1.8 to 1.18, 489, 1.15 to 490, 1.1, 491, 1.14 to 492, 1.15, 493, 1.12 to 1.17. Recusal was unwarranted. *Cf. United States v. Stotts*, 792 F.2d 1318, 1322 (5th Cir.1986) (heightened security in courtroom not ground for mistrial; "record is devoid of any evidence of prejudice" and "added security did not create an unacceptable risk of prejudice"); *United States v. Harrelson*, 754 F.2d 1153, 1164–66 (5th Cir.), *cert. denied*, 474 U.S. 908, 106 S.Ct. 277, 88 L.Ed.2d 241 (1985) (recusal of judge presiding over trial of defendants accused of conspiracy to murder federal judge unwarranted despite collegial relationship between the two and 24–hour–day security given presiding judge).[12]

## C. *Outrage*

In *Martino*, the Third Circuit stated that prosecutorial misconduct could be analyzed as "outrageous government conduct establishing a due process defense." 825 F.2d at 757. Defendants argue that the misconduct here may be so outrageous as to "preclude" their being extradited.

In *United States v. Jannotti*, 673 F.2d 578 (3d Cir.), *cert. denied*, 457 U.S. 1106, 102 S.Ct. 2906, 73 L.Ed.2d 1315 (1982) (*en banc*), the Third Circuit discussed the outrageous conduct defense:

*If the contours of the entrapment defense are imprecise, we have at least been able to make an effort to delineate them. A similar delineation of the conduct circumscribed by the due process defense is, at best, elusive.* Part of the difficulty stems from the differing views by those who must interpret the constitutional standard as to what are 'immutable and fundamental principles of justice.' *See Rochin v. California*, 342 U.S. 165, 176, 72 S.Ct. 205, 211, 96 L.Ed. 183 (1952) (Black, J., concurring). The other difficulty lies in a tendency for

---

**10.** Defendants admitted that they were members of an organization dedicated to Sikh independence and were active politically. Paragraphs 7, 31, 46, 47, 51, 52a, 54, Affidavit of Sukhminder Singh Sandhu (Affidavit U); Paragraphs 31, 50–52, 71–72, Affidavit of Ranjit Singh Gill (Affidavit W).

**11.** These security measures are described in the record. Hearing Tr. 181, 1.2 to 181, 1.1, 190, 1.24 to 194, 1.15; *Habeas* Tr. 10, 1.6 to 1.25.

**12.** Defendants also complain of the Court's failure to grant an adjournment. The adjournment was requested by defendant Gill. The basis for the denial of the application appears in the Letter–Opinion and Order filed January 20, 1988.

There is no evidence that the failure to grant an adjournment prejudiced either defendant. Defendant Gill's hearing was in fact adjourned to February 5, 1988. Hearing Tr. 16, 1.1 to 1.3. Defendant Gill was represented by counsel of his choice on that date. Nor is there any basis to contend that the absence of defendant Gill's counsel during defendant Singh's hearing on February 1–3, 1988 prejudiced the latter. Defendant Singh was represented by counsel of his choice and Mary Boresz Pike.

The only application for an adjournment during the hearings was premised on defendant Singh's desire to secure a handwriting expert. That application was denied on the basis of the Court's interpretation of the law governing extradition. Hearing Tr. 30, 1.16 to 32, 1.4, 39, 1.6 to 40, 1.11. Defendants were not prejudiced by the hearing being conducted after several adjournments and on dates which had been set months before. *See, e.g., David v. Attorney General, supra*, 699 F.2d at 415–16.

Defense counsel also stated that, because defendants were handcuffed and could not pick up documents to read, it was difficult to consult with defendants. Hearing Tr. 7, 1.23 to 8, 1.2; *Habeas* Tr. 4, 1.15 to 1.19. The District Court, on defendant Singh's *habeas* application, granted relief such that documents could be picked up and read. *Habeas* Tr. 16, 1.18 to 1.22.

the due process defense to overlap with the entrapment defense, notwithstanding the Supreme Court's clear admonition that they are separate and distinct.

In *United States v. Russell*, the Supreme Court, while firmly rejecting the defendants' effort to define the entrapment defense in terms of the government's conduct rather than the defendant's state of mind, nonetheless accepted that in certain extreme cases 'the conduct of law enforcement agents [may be] so outrageous that due process principles would absolutely bar the government from invoking judicial processes to obtain a conviction.' 411 U.S. [423] at 431–32, 93 S.Ct. [1637] at 1642–43 [36 L.Ed.2d 366 (1973)]. When the issue arose again, however, three years later in *Hampton v. United States*, the eight Justices who considered the case divided into three groups. The plurality opinion, written by Justice Rehnquist for three Justices, rested on the position that once predisposition has been shown, governmental misconduct can never be used to overturn a conviction, since the 'remedy of the criminal defendant with respect to the acts of Government agents ... lies solely in the defense of entrapment,' and a predisposed defendant is foreclosed from arguing entrapment. 425 U.S. [484] 488–90, 96 S.Ct. [1646] 1649–50 [48 L.Ed.2d 113 (1976)]. *There is some language in that opinion which may be read to question the availability of any due process defense: 'If the police engage in illegal activity in concert with a defendant beyond the scope of their duties the remedy lies, not in freeing the equally culpable defendant, but in prosecuting the police under the applicable provisions of state or federal law.'* Id. at 490, 96 S.Ct. at 1650.

Two Justices, in an opinion written by Justice Powell, concurred in affirming the conviction by rejecting both the entrapment defense and the applicability of a due process defense to the facts shown. The dissenting opinion of Justice Brennan, for the remaining three Justices, focused on the 'egregious' government conduct, and viewed the facts of the case

as presenting an instance of the 'sufficiently offensive' governmental conduct contemplated in *Russell.* Id. at 497, 96 S.Ct. at 1653.

Although the two concurring Justices whose opinion was pivotal agreed with the plurality that the government's supplying of contraband to one later prosecuted for trafficking in contraband does not constitute a *per se* denial of due process, 425 U.S. at 491, 96 S.Ct. at 1650 (Powell, J., concurring), they disagreed with the plurality view that 'the concept of fundamental fairness inherent in the guarantee of due process would never prevent the conviction of a predisposed defendant, regardless of the outrageousness of police behavior in light of the surrounding circumstances.' Id. at 492, 96 S.Ct. at 1651. Thus, a majority of the Court, composed of the three dissenting Justices and the two concurring Justices, has rejected the position 'that the defense of entrapment necessarily is the only doctrine relevant to cases in which the Government has encouraged or otherwise acted in concert with the defendant.' Id. at 492 n. 2, 96 S.Ct. at 1651 n. 2. Justice Powell emphasized, however, that 'the cases, if any, in which proof of predisposition is not dispositive will be rare,' and that '[p]olice overinvolvement in crime would have to reach a demonstrable level of outrageousness before it could bar conviction.' Id. at 495 n. 7, 96 S.Ct. at 1652 n. 7. [673 F.2d at 606–07 (emphasis added)].

*See, e.g., United States v. Ward*, 793 F.2d 551, 553–54 (3d Cir.1986).

In only one post-*Russell* decision has a defendant succeeded in asserting the defense. *United States v. Twigg*, 588 F.2d 373 (3d Cir.1978). As explained in the subsequent decision of *United States v. Ward*, *supra*, the court in *Twigg*,

determined that there was a 'demonstrable level of outrageousness' in the degree of official participation in the illegal manufacture of methamphetamine hydrochloride ('speed') and related offenses by the defendants in that case. Accordingly, the defendants' convictions for

these crimes were vacated. In *Twigg,* Kubica, a government informant, contacted Neville, a long-time acquaintance, and they agreed to manufacture and distribute speed. Neville provided $1,500 and was to be primarily responsible for distributing the product; defendant Twigg had a minor role. Kubica, meanwhile, undertook to supply the necessary equipment, raw materials, and laboratory location, and also directed the manufacturing operation. The Court, in a 2-to-1 decision, and without delineating a specific test, found on these facts a lack of fundamental fairness in defendants' convictions. [793 F.2d at 553–54].

Other than in *Twigg* the defense has been rejected in post-*Russell* decisions. *See United States v. Driscoll,* 852 F.2d 84, 85–86 (3d Cir.1988), (selection of defendant as target of undercover child pornography investigation and mailing of pornographic materials to him not outrageous); *United States v. Martino, supra,* 825 F.2d at 762–63 (issuance of grand jury subpoena to agent in undercover capacity not outrageous); *United States v. Ofshe,* 817 F.2d 1508, 1516 (11th Cir.), *cert. denied,* — U.S. ——, 108 S.Ct. 451, 98 L.Ed.2d 391 (1987) (government use of defense attorney as informant not outrageous); *Wilcox v. Ford,* 813 F.2d 1140, 1146–48 (11th Cir.), *cert. denied,* — U.S. ——, 108 S.Ct. 287, 98 L.Ed.2d 247 (1987) ("intimidation tactics" employed by police in interrogating certain persons not outrageous); *United States v. Simpson,* 813 F.2d 1462, 1464–69 (9th Cir.), *cert. denied,* — U.S. ——, 108 S.Ct. 233, 98 L.Ed.2d 192 (1987) (continued use of informant after FBI learned of informant's sexual involvement with defendant and "manipulation" of individual to be informant not outrageous); *United States v. Engler,* 806 F.2d 425, 429–30 (3d Cir. 1986), *cert. denied,* 481 U.S. 1019, 107 S.Ct. 1900, 95 L.Ed.2d 506 (1987) (action of undercover agent in meeting with defendant and discussing possible purchase of parts of protected animals not outrageous);

*United States v. Ward, supra,* 793 F.2d at 553–55 (proposal made to defendant by FBI informant that informant would finance marijuana distribution endeavor and undercover role of agents in negotiating purchase of drugs not outrageous); *United States v. Beverly,* 723 F.2d 11, 12–13 (3d Cir.1983) (*per curiam* ) (although court had "grave doubts about the propriety" of government agents' participation in arson scheme, conduct not outrageous); *United States v. Jannotti, supra,* 673 F.2d at 606–10 (Government use of middleman to bring forward corruptable officials in ABSCAM operation not outrageous).[13]

The Court doubts the availability of the defense as a matter of law. It does so for several reasons:

*Limitation of Defense.* In *Immigration and Naturalization Service v. Lopez–Mendoza,* 468 U.S. 1032, 104 S.Ct. 3479, 82 L.Ed.2d 778 (1984), the Supreme Court held that the exclusory rule does not apply in deportation proceedings. 468 U.S. at 1040–50, 104 S.Ct. at 3484–89. The Supreme Court also held that, regardless of any Fourth Amendment violations in the record, evidence derived from illegal arrests should not be suppressed: "we do not deal here with egregious violations of Fourth Amendment or other liberties that might transgress notions of fundamental fairness and undermine the probative value of the evidence obtained. *Cf. Rochin v. California,* 342 U.S. 165 [72 S.Ct. 205, 96 L.Ed. 183] (1952)." 468 U.S. at 1050–51, 104 S.Ct. at 3489–50 (footnote omitted).

In *Rochin v. California,* 342 U.S. 165, 72 S.Ct. 205, 96 L.Ed. 183 (1952), the conduct which was held to be outrageous was the stomach pumping of a defendant, as a consequence of which he vomited capsules which contained morphine. The capsules were the chief evidence against him. 342 U.S. at 166, 72 S.Ct. at 206. The Supreme Court concluded,

we are compelled to conclude that the proceedings by which this conviction was

---

**13.** The defense is a question of law. *United States v. Engler,* 806 F.2d at 430. Considered against the misconduct which the decisions collected above rejected as being outrageous, the

prosecutor's known misconduct here cannot be characterized as being so outrageous as to allow defendants to invoke the defense.

obtained do more than offend some fastidious squeamishness or private sentimentalism about combating crime too energetically. This is conduct that shocks the conscience. Illegally breaking into the privacy of the petitioner, the struggle to open his mouth and remove what was there, the forcible extraction of his stomach's contents—*this course of proceeding by agents of government to obtain evidence* is bound to offend even hardened sensibilities. They are methods too close to the rack and the screw to permit of constitutional differentiation. [342 U.S. at 172, 72 S.Ct. at 209 (emphasis added) ].

*Lopez–Mendoza* and *Rochin* suggest that the defense should be limited to instances in which government officials, through outrageous conduct, secure evidence against a defendant or assist a defendant to commit a crime.

Assuming this analysis to be correct, the defense fails as a matter of law. The prosecutor's known misconduct neither resulted in evidence against defendants nor assisted defendants to commit any crime.[14]

*Invasion of Protected Right.* In *United States v. Engler, supra,* the Third Circuit held that the defendant's allegations of outrageous conduct, which were "merely duplicative of his entrapment offense contentions," could not provide "an independent basis for a defense or acquittal." 806 F.2d at 429. Here, the known misconduct of the prosecutor could have affected the defendants' rights only if that misconduct had biased the Court. Consistent with *Engler,* no basis has been laid for the defense.

*Prejudice.* Even assuming that there may be sufficient evidence to establish outrageous conduct, defendants may not assert the defense absent demonstrable evidence of prejudice. *See United States v. Ofshe, supra,* 817 F.2d at 1516. The prosecutorial misconduct here did not prejudice them. Accordingly, the defense will not lie.

### D.  *Toscanino.*

Defendants also rely on *United States v. Toscanino,* 500 F.2d 267 (2d Cir.1974), for their preclusion argument. In *Toscanino* the Second Circuit considered "whether a federal court must assume jurisdiction over the person of a defendant who is illegally apprehended abroad and forcibly abducted by government agents to the United States for the purpose of facing criminal charges here." 500 F.2d at 271. The Second Circuit held:

we are satisfied that the 'Ker–Frisbie' rule cannot be reconciled with the Supreme Court's expansion of the concept of due process, which now protects the accused against pretrial illegality by denying to the government the fruits of its exploitation of any deliberate and unnecessary lawlessness on its part.... *Where suppression of evidence will not suffice, however, we must be guided by the underlying principle that the government should be denied the right to exploit its own illegal conduct, Wong Sun v. United States,* 371 U.S. 471, 488, 83 S.Ct. 407 [417], 9 L.Ed.2d 441 (1963), and *when an accused is kidnapped and forcibly brought within the jurisdiction, the court's acquisition of power over his person represents the fruits of*

---

14. *Martino* is consistent with this analysis. The questionable conduct in *Martino* was the issuance of a grand jury subpoena to an undercover agent under his pseudonym. Subpoenas were also issued to two persons, Martino and Caputo. Martino and Caputo, who were ultimately indicted for, among other things, conspiracy to commit perjury, met with the agent after issuance of the subpoenas and discussed testifying falsely before the grand jury. On pretrial motion the district court dismissed part of the indictment and suppressed evidence of conversations after the issuance of the subpoena to the agent. 825 F.2d at 756–57. The Third Cir-

cuit reversed, holding that the issuance of the subpoena "to protect a cover in an ongoing undercover investigation was not prosecutorial misconduct." 825 F.2d at 762.

The Third Circuit discussed outrage only briefly. The court recognized the need for undercover operations and held that, on the facts before it, the issuance of a pseudonymous subpoena was not a due process violation. 825 F.2d at 762–63. The facts before the court involved a Government undercover operation which led to the indictment of Martino and Caputo and the securing of evidence against them.

the government's exploitation of its own misconduct. Having unlawfully seized the defendant in violation of the Fourth Amendment, which guarantees 'the right of the people to be secure in their persons ... against unreasonable ... seizures,' the government should as a matter of fundamental fairness be obligated to return him to his *status quo ante.*

Faced with a conflict between the two concepts of due process, the one being the restricted version found in *Ker–Frisbie* and the other the expanded and enlightened interpretation expressed in more recent decisions of the Supreme Court, we are persuaded that to the extent that the two are in conflict, the *Ker–Frisbie* version must yield. *Accordingly we view due process as now requiring a court to divest itself of jurisdiction over the person of a defendant where it has been acquired as the result of the government's deliberate, unnecessary and unreasonable invasion of the accused's constitutional rights.* [500 F.2d at 275–76 (emphasis added) (footnote omitted)].

In concluding that a federal court need not accept jurisdiction the Second Circuit relied "upon our supervisory power over the administration of criminal justice in the district courts within our jurisdiction." 500 F.2d at 276.

The Second Circuit revisited *Toscanino* in *United States ex rel. Lujan v. Gengler,* 510 F.2d 62 (2d Cir.), *cert. denied,* 421 U.S. 1001, 95 S.Ct. 2400, 44 L.Ed.2d 668 (1975):

we did not intend to suggest that any irregularity in the circumstances of a defendant's arrival in the jurisdiction would vitiate the proceedings of the criminal court. In holding that *Ker* and *Frisbie* must yield to the extent they were inconsistent with the Supreme Court's more recent pronouncements we scarcely could have meant to eviscerate the *Ker–Frisbie* rule, which the Supreme Court has never felt impelled to disavow. Although we cited other cases in *Toscanino* as evidence of the partial erosion of *Ker* and *Frisbie, the twin pillars of our*

holding were *Rochin v. California, 342 U.S. 165, 72 S.Ct. 205, 96 L.Ed. 183 (1952)* and dictum in *United States v. Russell, 411 U.S. at 431, 432, 93 S.Ct. 1637,* both of which dealt with government conduct of a most shocking and outrageous character.... [510 F.2d at 65 (emphasis added)].

The cruel, inhuman and outrageous treatment allegedly suffered by Toscanino brought this case within the *Rochin* principle and demanded that we provide him a remedy. Since there was no 'fruit' of the abduction which could be suppressed other than the conviction which ensued, we concluded that the sole effective remedy was to order Toscanino's release if he proved his allegations. 500 F.2d at 275.

In sum, *but for the charge that the law was violated during the process of transporting him to the United States, Lujan charges no deprivation greater than that which he would have endured through lawful extradition.* We scarcely intend to convey approval of illegal government conduct. But we are forced to recognize that, absent a set of incidents like that in *Toscanino,* not every violation by prosecution or police is so egregious that *Rochin* and its progeny requires nullification of the indictment. [510 F.2d at 65–66 (emphasis added) (footnote omitted)].

*See United States v. Romano,* 706 F.2d 370, 372–73 (2d Cir.1983).

*Toscanino* denied the Government the fruit of illegal conduct by suppressing the body of a defendant. However, "[t]he 'body' or identity of a defendant ... is never itself suppressible as a fruit of an unlawful arrest, even if it is conceded that an unlawful arrest, search, or interrogation occurred." *Immigration and Naturalization Service v. Lopez–Mendoza, supra,* 468 U.S. at 1039, 104 S.Ct. at 3483. "[T]he continuing validity of the *Toscanino* approach is questionable...." *United States v. Darby,* 744 F.2d 1508, 1531 (11th Cir. 1984), *cert. denied,* 471 U.S. 1100, 105 S.Ct.

**160**

2322, 85 L.Ed.2d 841 (1985).[15]

*Toscanino* may remain viable. As *Gengler* teaches, *Toscanino* may be considered in terms of the outrageous conduct defense since "the twin pillars" of *Toscanino* were *Rochin* and *Russell.* Nevertheless, there are several reasons to conclude that *Toscanino* is inapplicable as a matter of law:

■ *Jurisdiction Over the Person.* Assuming *Toscanino* to address the circumstances under which a court acquires jurisdiction over a defendant, the record demonstrates that defendants Singh and Gill entered the United States voluntarily and were apprehended by law enforcement officers. Defendants offer nothing to suggest that the Court acquired jurisdiction over them through outrageous conduct by any representative of the Government. Accordingly, if *Toscanino* is limited to the acquisition of jurisdiction, defendants may not invoke it. *See United States v. Darby, supra,* 744 F.2d at 1530–31; *United States v. Wilson,* 732 F.2d 404, 410–11 (5th Cir.), *cert. denied,* 469 U.S. 1099, 105 S.Ct. 609, 83 L.Ed.2d 718 (1984); *United States v. Wilson,* 721 F.2d 967, 971–72 (4th Cir.1983); *David v. Attorney General, supra,* 699 F.2d at 413–15.

In *David,* the Seventh Circuit Court of Appeals had before it an appeal from a district court's denial of a *habeas* petition. The respondent sought collateral review of an order which certified him as extraditable to France. The respondent's "primary defense was that his presence in the United States was not voluntary, but that he was kidnapped from Brazil by agents of the United States and thus the court lacked jurisdiction over him...." 699 F.2d at 413.

In rejecting the defense the Seventh Circuit held:

> Even assuming that this Court accepted the Toscanino principle in a federal criminal proceeding (which is still an open question, see, United States v. Marzano, 537 F.2d 257, 271–72 (7th Cir. 1976)), we conclude that it is clearly inapplicable in the circumstances of this case. As noted previously, Toscani-

*no* requires the court to divest itself of jurisdiction in order to deprive the government of the fruits of its illegal conduct. *However, David is asking us to penalize France for the allegedly illegal conduct of American agents.* To require the extradition magistrate to divest himself of jurisdiction would not serve to deter illegal conduct on the part of United States' officials since the fruit of that alleged conduct, i.e., the guilty plea and subsequent sentence, would be unaffected. Based on similar reasoning, the Second Circuit has held that the exclusionary rule is inapplicable in extradition proceedings, *Simmons v. Braun,* 627 F.2d 635 (2d Cir.1980); *see also, Magisano v. Locke,* 545 F.2d 1228 (9th Cir. 1976).

> We note that David has suggested that France was indirectly involved in his kidnapping in that it was aware of the plan and intended to arrange a trade of prisoners with the United States upon his arrival here. Thus, he argues, France will enjoy the fruit of the illegal conduct (especially in view of the fact that France had no extradition treaty with Brazil). David's allegations, however, do not implicate France in any unconstitutional conduct within our jurisdiction. *Furthermore, assuming arguendo the commission of any impropriety by French officials elsewhere, we are not the proper authority to apply sanctions.* That matter would be for the French courts (or other authorities) to consider.... Therefore, we conclude that the *Toscanino* defense is unavailable to the petitioner in this case. [699 F.2d at 414–15 (emphasis added) (footnote omitted)].

*Prejudice.* Considering *Toscanino* in terms of outrage, a prerequisite to invocation of that defense is prejudice. In *Leiterman v. Rushen,* 704 F.2d 442 (9th Cir. 1983), the court discussed *Toscanino:*

> We have noted in dicta that outrageous and shocking conduct by law enforcement agents might so infect a conviction with deprivation of constitutional rights that the conviction will be set aside on

**15.** *Toscanino* does not appear to have been     adopted by the Third Circuit Court of Appeals.

due process grounds, *United States v. Fekri*, 650 F.2d 1044, 1045–1046 (9th Cir. 1981), (entrapment—affirmed). *We have found no cases, however, actually setting aside a state conviction unless the conduct in question was causally related to the conviction.* See, e.g., *Rochin v. California*, 342 U.S. 165, 72 S.Ct. 205, 96 L.Ed. 183 (1952) (stomach pump). There is some authority for the proposition that a federal conviction might be set aside if the defendant could show that he was brought within the territorial jurisdiction of the court by means of outrageous activities by United States officials. *See, e.g., United States v. Toscanino*, 500 F.2d 267 (2d Cir.1974) (conviction challenged (unsuccessfully) on ground defendant had been abducted and tortured by local police in Uruguay and tortured in Brazil); *on remand, United States v. Toscanino*, 398 F.Supp. 916 (E.D.N.Y.1975) (no claim of participation by United States officials in the abduction or torture). *No causal connection between the police violence and the conviction is presented in this appeal.*

This court has had only limited occasion to refer to the *Toscanino* case in cases that began as federal cases. *See United States v. Fielding*, 645 F.2d 719, 723 (9th Cir.1981). In *Fielding*, the defendant had made no showing that the United States was involved in his mistreatment. *Id.* at 724. In this case, unlike *Fielding*, the misconduct was committed by local law enforcement officers. *Those officers were subject to some degree of federal constitutional oversight by their own courts and to a degree of indirect monitoring in the federal courts if federal constitutional violations were instrumental in convicting.* The officers had probable cause to search the defendants' automobiles and to seize any contraband they might find, before the shooting started. The shooting had nothing to do with the production of evidence or the decision to prosecute, and accordingly did not, of itself, call for the exclusion of any specific evidence on due process grounds. [704 F.2d at 443 (emphasis added)].

The known misconduct of the prosecutor here was not causally related to the issuance of the Certifications. *Toscanino* is inapplicable.

▮ *Exercise of Supervisory Power.* In *Toscanino*, the Second Circuit created a remedy for outrageous behavior through the exercise of its supervisory power. However, it is inappropriate for a federal court to exercise that power absent a showing of prejudice to a defendant and consideration of narrower means to deter misconduct. *United States v. Hasting, supra.* The prosecutor's known misconduct did not prejudice defendants. Narrower means to deter misconduct are available.

\* \* \*

Defendants also rely on *Republic of France v. Moghadam*, 617 F.Supp. 777 (N.D.Ca.1985). This Court discussed *Moghadam* in a prior opinion. *See* Opinion filed November 2, 1987, 123 F.R.D. 127, 127–29.

In *Moghadam*, the primary evidence offered by the Government in support of a probable cause finding was the statement of a woman to French authorities which implicated the defendant, whose extradition to France was sought. The woman later wrote a second letter, *"fully recanting* her accusations against Moghadam." 617 F.Supp. at 779 (emphasis in original). In addressing probable cause, the United States District Court for the Northern District of California noted:

Moghadam relies principally on the existence of the recantation letter as obliterating probable cause. In addition he stresses the conduct of law enforcement officials in this country, especially what he considers to be overreaching on the part of United States multigovernment in seeking extradition to France. [617 F.Supp. at 782 (footnote omitted)].

The *Moghadam* court found "the government's conduct ... disturbing, [although] it does not rise to the level justifying the denial of extradition solely for that reason." 617 F.Supp. at 782 n. 6. *Moghadam* considered the Government's conduct in

making a probable cause determination. 617 F.Supp. at 782–84 & n. 6.

*Moghadam* is not persuasive. First, although *Moghadam* stated in *dictum* that government misconduct could justify denial of extradition, it offered no support for that proposition and failed to identify the source (constitutional or supervisory) for any such power. Second, *Moghadan* failed to address the necessity for a showing of demonstrable prejudice to an extraditee prior to the implementation of any remedy.

\* \* \*

■ For the reasons set forth in Section II of this opinion, the Court is satisfied that, assuming the prosecutor's misconduct to have been limited to be manufacture of threats to herself and the Court, defendants are not entitled to discovery inasmuch as they would not be entitled to substantive relief. The Court will turn to discovery of other possible misconduct by the prosecutor.[16]

### III. POSSIBLE PREHEARING MISCONDUCT

Defendants argue that, "[i]t is difficult to find any part of this case which does not rest upon the representations of the prosecutor." Respondents' Memorandum of Law at 11. The Court disagrees. The Certifications were issued on the basis of findings that probable cause existed to believe that defendants were sought by the Government of India for certain crimes alleged to have been committed there. Hearing Tr. 223, 1.3 to 272 1.4, 485, 1.3 to 496, 1.16. Central to these findings were affidavits submitted by the Government.[17] The question of possible prehearing misconduct by the prosecutor should be considered in the context of manufacture or alteration of any or all these affidavits.[18]

---

**16.** In addition to discovery of the prosecutor's motive, defendants propose to inquire into "who else, if anyone, aided or knew about the misconduct." Argument Tr. 11, 1.8 to 1.9. The purpose of the latter discovery is to seek evidence of some conspiracy. See Transcript of April 12, 1988 Conference at 7, 1.4 to 14, 1.14.

Defendants may not pursue the line of inquiry for several reasons. First, absent demonstrable prejudice to defendants from the prosecutor's known misconduct, discovery of any official complicity would be irrelevant. Second, defendants propose to pursue the line of inquiry on the basis of pure speculation. In this regard, the Public Integrity Section has represented that the continuing investigation of the prosecutor's misconduct has disclosed no evidence which implicates the Government of India. Argument Tr. 19, 1.25 to 24, 1.18. The Court will not allow discovery into any official complicity in the prosecutor's known misconduct.

Discovery is sought of both criminal investigation and grand jury materials. Given the ruling above, the Court need not consider, among other things, whether grand jury secrecy may be broken, *see Douglas Oil Co. v. Petrol Stops Northwest,* 441 U.S. 211, 222, 99 S.Ct. 1667, 1674, 60 L.Ed.2d 156 (1979), and whether grand jury materials should be reviewed *in camera.* See *In re Grand Jury Proceedings (Wright II),* 654 F.2d 268, 274–75 (3d Cir.), *cert. denied,* 454 U.S. 1098, 102 S.Ct. 671, 70 L.Ed.2d 639 (1981); *In re Midwest Milk Monopolization Litigation,* 454 F.Supp. 281, 287–8 (W.D.Mo.1978).

**17.** These were the affidavits of D.B. Bangia, S.V. Rao Kelsikar (Exhibit G–1A), N.K. Patni, S.C. Pandya (Exhibit G–2), V.S. Kumbhar, S.K. Ki-shore, J.G. Bhave (Exhibit G–3), C. Prabhakar, B.D. Sanghvi (Exhibit G–4), S.K. Saxena (Exhibit G–5), M.K. Kanabur (Exhibit G–6), A.K. Kanth and S. Malik (Exhibit G–7). The Government also introduced the confession of Sukhdev Singh (Exhibit G–8) and the Declaration of JoAnn Dolan (Exhibit G–9).

The Government did offer several witnesses. Special Agent Mallon of the Immigration and Naturalization Service testified to statements made by defendants after their arrest. Hearing Tr. 44, 1.22 to 52, 1.25, 444, 1.14 to 448, 1.14. The statements of defendants, Exhibits G–10 and G–11, were admitted into evidence.

The Government also offered the testimony of Roy L. McDaniel, a Supervisory Fingerprint Specialist with the Federal Bureau of Investigation. Mr. McDaniel examined fingerprints taken from a crime scene in India and, based on a comparison with fingerprints of defendant Singh, concluded that the fingerprints matched. Hearing Tr. 92, 1.1 to 121, 1.13.

Narendra Patni also testified. Mr. Patni is an Additional Superintendent of Police with the State Government of Rajastan in India. Mr. Patni's testimony was introduced to establish the chain of custody of the fingerprints taken from the crime scene. Defendant Singh was permitted to go beyond cross-examination and examine Mr. Patni on a photographic identification. Hearing Tr. 123, 1.15 to 148, 1.19.

**18.** The affidavits were executed between June 11 and June 24, 1987 and were presented to the United States Embassy in New Dehli on July 1, 1987. The prosecutor visited India between May 30 and June 10, 1987. Paragraphs 3 and 4, Declaration of John L. Lister.

In *California v. Superior Court of California*, 482 U.S. 400, 107 S.Ct. 2433, 96 L.Ed.2d 332 (1987), the Supreme Court held that, in an interstate extradition proceeding, "the asylum State is bound to deliver up to the demanding State's agent a fugitive against whom a properly certified indictment or affidavit charging a crime is lodged." 107 S.Ct. at 2438.

The admissibility of evidence in an international extradition proceeding is governed by 18 U.S.C. § 3190. Defendants stipulated to the admissibility of the affidavits under that statute. Hearing Tr. 26, 1.1 to 1.14, 66, 1.4 to 9, 441, 1.17 to 1.24. *California* suggests that, since the affidavits were in proper form, "this ends the inquiry." 107 S.Ct. at 2439.

Despite the similarities between interstate and international extradition, the Court is not satisfied that *California* is controlling. These forms of extradition were compared in *Restatement (Third) of the Foreign Relations Law of the United States:*

> *Inter–State and international extradition compared.* In principle, extradition from one nation-state to another is similar to extradition from one State to another within the United States. The principal steps-request by the executive of the demanding State to the executive of the State where the person is believed to be present, arrest upon a warrant, and a limited judicial hearing, generally by habeas corpus-are analogous, though not identical; some of the limitations on international extradition designed to guard against delivery of a person to a country with standards of justice lower than those of the forum are not applicable ... in general, *judicial scrutiny of the extradition request is narrower than in international extradition.* See *Biddinger v. Commissioner of Police*, 245 U.S. 128 [38 S.Ct. 41, 62 L.Ed. 193] (1917). [§ 478 reporters' note 8 (emphasis added)].

The Court must once again borrow an analogy from another area of the law. The appropriate analogy is to *Franks v. Delaware*, 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed. 2d 667 (1978).

In *Franks*, the Supreme Court held that, where the defendant makes a substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit, and if the allegedly false statement is necessary to the finding of probable cause, the Fourth Amendment requires that a hearing be held at the defendant's request. [438 U.S. at 155–56, 98 S.Ct. at 2676–77]. *Franks* expanded on this holding:

> There is, of course, a *presumption of validity* with respect to the affidavit supporting the search warrant. To mandate an evidentiary hearing, the challenger's *attack must be more than conclusory and must be supported by more than a mere desire to cross-examine.* There must be allegations of deliberate falsehood or of reckless disregard for the truth, and those allegations must be accompanied by an offer of proof. They should point out specifically the portion of the warrant affidavit that is claimed to be false; and they should be accompanied by a statement of supporting reasons. Affidavits or sworn or otherwise reliable statements of witnesses should be furnished, or their absence satisfactorily explained. Allegations of negligence or innocent mistake are insufficient. The deliberate falsity or reckless disregard whose impeachment is permitted today is only that of the affiant, not of any nongovernmental informant. Finally, if these requirements are met, and if, when material that is the subject of the alleged falsity or reckless disregard is set to one side, there remains sufficient content in the warrant affidavit to support a finding of probable cause, no hearing is required. On the other hand, if the remaining content is insufficient, the defendant is entitled, under the Fourth and Fourteenth Amendments, to his hearing. Whether he will prevail at that hearing is, of course, another issue. [438 U.S. at 171–72, 98 S.Ct. at 2684–85 (emphasis added) (footnote omitted)].

*Franks* was premised on the Warrant Clause of the Fourth Amendment and on the conclusion that, "it would be an unthinkable imposition upon his [a magistrate's] authority if a warrant affidavit, revealed after the fact to contain a deliberately or reckless false statement, were to stand beyond impeachment." 438 U.S. at 165, 98 S.Ct. at 2681.

To invoke *Franks* a defendant must make a "substantial preliminary showing." *Franks v. Delaware, supra; United States v. Calisto,* 838 F.2d 711, 714 (3d Cir.1988). That showing is not met by bare allegations of impropriety. *United States v. Helmel,* 769 F.2d 1306, 1321 (8th Cir. 1985); *United States v. Rodgers,* 732 F.2d 625, 628 (8th Cir.1984); *United States v. Phillips,* 727 F.2d 392, 400 (5th Cir.1984). Even assuming that a substantial preliminary showing is made, a court must then engage in the redaction process described in *Franks.* This process was deemed by the Third Circuit in *Calisto* to be

> *a vehicle for determining whether there was a causal connection between the alleged misrepresentation in that case and the challenged search.* If the information in the affidavit without the misrepresentation provided probable cause and the warrant should thus have been issued even had there been no scheme to deceive, there would be no causal connection between the scheme and the search and the search would not be tainted. [838 F.2d at 715 (emphasis added)].

The *Franks* test offers a simple and well-defined means to review the effect of any prehearing misconduct on the probable cause findings.[19]

What substantial preliminary showing have defendants made? Defendants offer two examples of prehearing misconduct. First, defendants allege that,

> [t]he government of India already stands before this Court with unclear [*sic*] hands. The findings of the formal committee of inquiry appointed by the Chief Minister of Punjab and headed by a retired High Court justice revealed serious charges earlier brought against respondents to be the product of a police conspiracy. [Respondents' Memorandum of Law at 15 n. 7].

Second, defendants argue that the prosecutor misrepresented the contents of certain documents. Respondents' Memorandum of Law at 13–14.[20]

Defendants also offer the following:

*Travel Restrictions.* By letter dated August 25, 1987, the prosecutor advised the Court that defense counsel would not be granted special permits to travel in "restricted and border areas such as the Punjab." According to defendants, "[t]his letter contained certain false statements related to travel time and distances to and from various parts of India. Respondents demanded a statement of reasons as to why the Punjab visas were denied, and corrected the prosecutor's false statements." Respondents' Memorandum of Law at 13.

The representations are of no significance. Defendants do not dispute that their counsel were free to visit the scenes of the alleged crimes in issue. Moreover, it is abundantly clear from the record that defense counsel had access to a number of

---

19. The analogy must not be taken too far. Defendants note that, "[t]he actual charging documents, commencing this entire process, are affidavits" executed by the prosecutor. Respondents' Memorandum of Law at 11. The Warrant Clause applied to those affidavits. *Restatement (Third) of the Foreign Relations Law of the United States* § 478 reporters' note 1. That being said, since the bodies of defendants are not suppressible the inquiry of the Court will focus on the affidavits which were introduced at the hearings.

Similarly, extradition proceedings have a limited purpose and a defendant's proofs are limited. *See* Opinion filed September 1, 1987, 123 F.R.D. 108, 110–11. *Franks* should not be applied to vary either the nature of the proceedings or the limitation on defendants' proofs.

20. The Government of India does not stand before the Court with unclean hands. The Court has made no finding that the Government of India is acting in bad faith in seeking the extradition of defendants Singh and Gill, nor does the Court intend to usurp the role of the Secretary of State by permitting defendants to make any such inquiry.

The documents were introduced at the hearings. Exhibits D–2, D–4, D–5, D–6, D–8 and D–9. Whether the prosecutor misrepresented anything is subject to dispute.

Indian nationals. See Opinion filed February 17, 1988 at 39 n. 11; Opinion filed September 1, 1987, 123 F.R.D. 108, 123 n. 25; Affidavits A through T and V; Paragraph 5, Affidavit of Mary Boresz Pike filed June 13, 1988.

*Disclosure of Sealed Affidavits.* Defendants proffered various affidavits in support of the contention that they were refugees. These affidavits were introduced under seal. Hearing Tr. 399, 1.11 to 403, 1.14. Defendants assert that the affidavits may have been turned over to the Government of India by the prosecutor. Respondents' Memorandum of Law at 12. This is pure speculation. Defendants offer no basis in fact to even permit a reasonable inference that any sealed document was turned over.

*Modification of Documents.* Defendants assert that their "concerns about the modification of documents naming Sukhvinder Singh to documents naming Sukhminder Singh * * * take on a new dimension [given the prosecutor's known misconduct]." Respondents' Memorandum of Law at 11–12. This concern, however, is a long-standing one. See Opinion filed September 1, 1987, 123 F.R.D. 108, 117; Exhibit D–3. Discrepancies in one letter in defendant Singh's name are irrelevant given that the probable cause findings were premised on photographic or other identification of him.

*Prosecution in India.* Defendants questioned the possibility of being prosecuted under the Terrorist and Disruptive Activities Act of 1985 should they be extradited. The prosecutor represented that defendants would not be tried under that statute and that the Government of India would adhere to the doctrine of specialty. Hearing Tr. 384, 1.18 to 387, 1.1. Defendants question the truthfulness of the representations. Respondents' Memorandum of Law at 9–10.

The truthfulness of the representations is of no significance. The fate of defendants should they be extradited is a question for the Secretary of State. *See generally* Opinion and Order filed November 2, 1987, 123 F.R.D. 127. Whether the Government of India made the statements attributed to it is a question for the Secretary. Hearing Tr. 391, 1.10 to 394, 1.10.[21]

None of the above, either separately or cumulatively, rise to the level of a substantial preliminary showing that the prosecutor either manufactured or altered the affidavits which were central to the probable cause findings. Accordingly, the Court must consider whether defendants are entitled to discovery on possible manufacture or alteration of the affidavits.

The Court has concluded that defendants have no general constitutional right to discovery and that the Court does not possess inherent power to afford discovery. Opinion filed September 1, 1987, 123 F.R.D. 108, 111–16. The Court also concluded that, consistent with the decision of the Third Circuit Court of Appeals in *In re Complaint of Bankers Trust Company,* 752 F.2d 874 (3d Cir.1984), "although a litigant has no *general* constitutional right to discovery, there may be circumstances under which *specific* discovery must be afforded as a matter of due process." Supplemental Opinion filed September 11, 1987, 123 F.R.D. 123, 126.

Given the known misconduct of the prosecutor and the centrality of the affidavits, the Court is compelled to conclude that defendants are entitled to limited discovery. *See In re Complaint of Bankers Trust Company, supra,* 752 F.2d at 890–91. The discovery must be focused on the affidavits and on the opportunities, if any, afforded the prosecutor to manufacture or alter the affidavits.

The Court will allow the following discovery:

1. The Government shall produce for inspection all written communications or summaries of oral communications between the prosecutor and any representative of the Government of India up to

---

**21.** The Court's catalogue of defendants' examples of possible misconduct is not intended to be exhaustive.

and through July 6, 1987, the date on which the affidavits were delivered to the State Department. Given the apparent existence of an attorney-client relationship and the work product privilege, all documents are to be submitted to the Court for *in camera* review in the first instance. The Government shall submit the documents with an accompanying affidavit on August 30, 1988.

2. The Government shall also produce for *in camera* inspection all memoranda or other documents evidencing or reflecting meetings between the prosecutor and any affiant or representative of the Government of India during the prosecutor's visit to India between May 30 and June 10, 1987.

3. Defendants may serve on each affiant (other than JoAnn Dolan and S.K. Saxena) twenty-five (25) written interrogatories, including subparts. The interrogatories shall be served through the United States Attorney for the District of New Jersey, who shall submit the interrogatories through appropriate channels to the Government of India. Defendants may inquire whether the affiants in fact executed the affidavits and, if so, whether the affidavits were altered in any way after execution. The Government and defendants shall agree to form and content of the interrogatories not later than September 9, 1988. Should there be a dispute counsel shall appear before the Court at 10:00 A.M. on September 12, 1988. Answers to interrogatories, in a form consistent with 18 U.S. C. § 3190, shall be filed with the Court and served not later than October 14, 1988.[22]

## CONCLUSION

For the reasons set forth above, the Court is satisfied that defendants are entitled to limited discovery on the affidavits submitted by the Government in support of the probable cause findings.

An Order accompanies this Opinion.

## ORDER

This Court having issued its Opinion on July 29, 1988; for the reasons set forth therein; good cause appearing

It is on this 29th day of July, 1988

ORDERED THAT:

1. Except as set forth in the Opinion at pages 165 and 166, defendants' motion to compel discovery is denied;

2. Oral argument on the Government's motion to vacate shall be conducted at 10:00 A.M. on October 31, 1988. Defendants may submit a written response to the motion not later than October 24, 1988.

---

**22.** The Court appreciates that defendants wish to depose the prosecutor. However, the prosecutor intends to invoke her Fifth Amendment rights. Argument Tr. 29, 1.22 to 30, 1.24. Moreover, and consistent with this opinion, any deposition would be limited to possible manufacture or alteration of the affidavits. The Court is satisfied that the above discovery will make deposition of the prosecutor unnecessary.