UNITED STATES of America, Appellee,

v.

Joseph E. GRIFFIN, Jr., Defendant-Appellant.

No. 75–1130.

United States Court of Appeals, First Circuit.

Decided Nov. 20, 1975.

Argued Oct. 8, 1975.

Certiorari Denied March 1, 1976. See 96 S.Ct. 1414.

---

Paul F. Markham, Boston, Mass., by appointment of the Court, with whom Edward F. Harrington, and Gargan, Harrington, Markham & Wall, Boston, Mass., were on brief, for appellant.

John F. Conroy, Atty., Dept. of Justice, with whom J. Stanley Pottinger, Asst. Atty. Gen., James N. Gabriel, U. S. Atty., and Robert A. Murphy, Atty., Dept. of Justice, were on brief, for appellee.

Before COFFIN, Chief Judge, and ALDRICH and CAMPBELL, Circuit Judges.

ALDRICH, Senior Circuit Judge.

Defendant, found guilty by a jury on both counts of an indictment, appeals because of the court's admission of certain testimony, and its failure to direct acquittals. Title 18 U.S.C. § 245(b)(4)(A), count 1, forbids willfully injuring "any person . . . in order to intimidate . . . any other person or any class of persons from . . . without discrimination on account of race, color . . . [attending any public school.]" Title 18 U.S.C. § 1509, count 2, forbids forcefully and willfully attempting "to prevent, obstruct, impede, or interfere with, the due exercise of rights . . . under any order . . . of a court of the United States." The questions arise because of the court's permitting the jury to find that the clubbing of one Andre Yvon Jean Louis, a black, by the defendant in South Boston on October 7, 1974, could be found to be in violation of both statutes.

In June, 1974, the Massachusetts District Court issued an order for enforced busing in the South Boston public schools. We take judicial notice that the ensuing busing received substantial publicity and aroused widespread resentment. In October police details were assigned to South Boston to protect person and property. On the afternoon of October 7 a detail was assigned to the intersection of Old Colony Avenue and Dorchester Streets, some blocks away from the Patrick Gavin School, and through

which buses returning blacks from that school normally passed. In fact that afternoon the buses were rerouted, but this was not publicly known. A crowd of 400 to 500 had gathered on the street and sidewalks. Some objects were thrown, and there was much shouting. Initially the shouts were adjurations to the police to leave so that the crowd could "take care of these niggers," but when the usual hour for the buses had passed, the cry was as to their whereabouts. Defendant, prominent because he wore a checkered lumberjacket on a hot afternoon, and was the only adult in the street crowd, was heard shouting inquiries as to where were the buses; "Where are the (obscene) niggers?"; "Get the (obscene) cops out of here." Traffic was moving slowly when Jean Louis sought to drive by. Defendant called out, "Let's get the (obscene) nigger." Thereupon a segment of the crowd ran to Jean Louis' car, broke the widows and dragged him out. When he sought to escape defendant pursued him and beat him with a club—a hammer handle previously observed in defendant's pocket—incapacitating him for several weeks.

Jean Louis, a black adult, was not a student, nor a parent, nor otherwise connected with any Boston public school. We agree with defendant that there was no direct evidence that by the act of beating him defendant intended to prevent black students from attending school. On the other hand, defendant presented no evidence, and there was no affirmative testimony supporting the assertion in his brief that his action was born simply out of frustration and his hatred for blacks, and "was not carried out with the thought that as a result of the beating busing would be prevented." We cannot agree that this conclusion was established by the fact that defendant "initiated his act of assault [by] 'let's get the (obscene) nigger,' not 'let's intimidate the students.'" Given the circumstances, the jury could well find that defendant intended the indiscriminate beating of an innocent black on the public street near a school at school release time, with the police unable to prevent it, to have a chilling effect upon other blacks, parents or children. The general inculcation of fear in order to further a specific objective is familiar practice.

Equally unacceptable is defendant's argument that his inquiries as to the whereabouts of the school children, and adjurations to the police to leave, were irrelevant because, in fact, the buses did not come. Nor does the nature of defendant's expressed interest and intent change simply by reason of counsel's conclusion that his state of mind was one of frustration. At the least, there was a jury question as to a more specific intent.

■■ It was, of course, unnecessary for the government, in order to prove willfulness, to show that in attempting to impede blacks from going to school, defendant knew he was violating a federal statute. It was enough under 18 U.S.C. § 245 that he purposely sought to interfere with the right of black children to go to school; he need not know the exact extent, or the federal character of that right. Cf. *United States v. Feola*, 1975, 420 U.S. 671, 95 S.Ct. 1255, 43 L.Ed.2d 541; *United States v. Langone*, 1 Cir., 1971, 445 F.2d 636, *cert. denied*, 404 U.S. 915, 92 S.Ct. 226, 30 L.Ed.2d 189 (defendant who knowingly assaults someone need not know of jurisdictional requirement that victim is a federal officer engaged in performing his duties). It may be argued that defendant was correspondingly in violation of 18 U.S.C. § 1509 for willfully interfering with "rights . . . under any order, judgment or decree of a court of the United States." We are, however, troubled by such a proposition. In *Langone* defendant was guilty of an assault, and he was tried for assault; the statute was enacted to give particular protection to federal officers. The court order in section 1509 does more than provide federal jurisdiction. Insofar as it states a separate offense from, in this case, section 245, it is directed towards a state of mind on the part of the defendant, intentional obstruction of justice. Cf. *Pettibone v.*

*United States*, 1893, 148 U.S. 197, 13 S.Ct. 542, 37 L.Ed. 419. We hold that with respect to count 2 the government was obliged to show that defendant knew of the order.

 Defendant did not take the stand, and there was no direct evidence as to his actual knowledge. The government offered a quantity of newspaper and television files intended to show wide publicity, but the court excluded them. It is not altogether clear why it did.[1] Possibly it was because the files were not separated so as to distinguish between reports of the court order and general accounts of busing. The government offered no other evidence, such as testimony of notoriety or general knowledge of the order in the neighborhood. The evidence of the crowd's conduct cannot support the jury verdict since there is nothing indicating that the members of the crowd realized that the busing it protested emanated from a federal court order as distinguished from some other source of authority. We agree with the district court that it would not be necessary to show knowledge of the specific terms of the order, and we might have had no problem if the government had introduced evidence of broad neighborhood knowledge or publicity, but absent evidence from which to infer awareness of the order by the defendant, we must find that the government did not make out its case.[2]

 The evidence that defendant objects to as to the activities and utterances of the crowd was clearly admissible with respect to count 1. This evidence was not offered to charge defendant with responsibility for the crowd's actions and words, but to show his own state of mind. For a considerable period defendant had been in the crowd's center, not as a sidewalk observer, but as an active participant. The evidence of what the crowd had been doing and shouting indicates what, in action and words, defendant was responding to, clarifying, if need be, his own words and motives. In the absence of credible evidence to the contrary, the jury could well find that defendant was in accord with the manifested purposes of the crowd.

*The conviction under count 1 is affirmed. On count 2 defendant is ordered acquitted.*

---

1. It is also not clear why the government felt it necessary to prosecute under this more complex count, which subsumed a finding of all facts necessary to establish a violation of the other count which itself entailed in all cases an equal, and in this case a greater penalty. We cannot conceive that a jury which acquitted on count 1 would convict on count 2.

2. Although it might be appropriate for this court to consider taking judicial notice that there was such general neighborhood knowledge to warrant of itself a jury finding that an otherwise unidentified individual realized that the busing in Boston resulted from a federal court order, we were not asked to take such notice, and will not do so spontaneously. The government did say that a jury must be allowed to draw inferences from the surrounding circumstances, which is true, but that means circumstances of record.