UNITED STATES of America, Plaintiff,

v.

Robert E. COOLEY, Gary P. Leber, Charles W. Matson, Ronald L. Taylor, Merrie W. Turner, Defendants.

Nos. 91–10066–01, 91–10073–01, 91–10075–01, 91–10087–01 and 91–10088–01.

United States District Court,
D. Kansas.

Feb. 18, 1992.

Lee Thompson, U.S. Atty., Wichita, Kan., for U.S.

Robert E. Cooley, pro se.

Steve Gradert, Asst. Federal Public Defender, Wichita, Kan., for defendant Leber.

Charles D. Anderson, Federal Public Defender, Wichita, Kan., for defendant Matson.

Craig Shultz, Wichita, Kan., for defendant Taylor.

Gregory Skinner, Asst. Federal Public Defender, Topeka, Kan., for defendant Turner.

## MEMORANDUM AND ORDER

PATRICK F. KELLY, District Judge.

On November 26, 1991, the jury returned its verdict finding all five defendants guilty of violating 18 U.S.C. § 1509. Section 1509, a misdemeanor offense, prohibits the willful obstruction or impedance of court orders through the use of threats or by force.

Motions for acquittal or in the alternative for a new trial were subsequently filed by defendants Charles W. Matson, Merrie Turner, and Gary P. Leber on December 4, 1991, and by defendant Ronald L. Taylor on December 6, 1991. On the same day each motion was filed, the court granted accompanying motions requesting extensions of time and allowed until December 20 to file their briefs. On December 18, the court further extended the time for the filing of briefs, requiring defendants to have their briefs on file on or before January 3, 1992. All of the above-named defendants complied with this briefing schedule. Defendant Robert E. Cooley, appearing *pro se*, filed his motion for acquittal or in the alternative for a new trial on January 3, 1992, and at the same time moved to join in the motions and briefs submitted by the other defendants.

The convictions which the defendants now seek to set aside arise from events occurring on August 20, 1991, at a Wichita abortion clinic located on East Kellogg Street. This clinic was under the protection of a preliminary injunction issued by this court in a separate civil action. *Women's Health Care Services, P.A. v. Operation Rescue–National*, 773 F.Supp. 258 (D.Kan.1991) (granting injunction). This injunction prohibits, *inter alia*, any attempt to trespass upon or block the entrance routes to the plaintiff clinics.

During July and August, 1991, Wichita was the target of anti-abortion activists seeking to close abortion clinics by the tactic of "rescue," which involves physically preventing entrance to a clinic by acts of trespass and obstruction. During these months, hundreds and perhaps thousands of persons came to Wichita from across the nation to engage in such activity. Among those persons were the defendants in the present action. Faced with the consistent and frequent violation of the court's orders, the court was compelled to order United States Marshals to the plaintiff clinics to help enforce the injunction.

On August 20, 1991, activists at the East Kellogg clinic departed from the tactics consistently utilized up to that time. In-

stead of slowly and peacefully approaching the main driveway into the clinic parking lot from across the street and sitting down before the gate, a large number of persons simultaneously charged the driveway gate protected by marshals from the outside. At the same instant, a crowd of perhaps 40 persons, including the defendants, scaled the fences and walls surrounding the parking lot and then charged the marshals protecting the gate by traveling across the interior of the clinic lot.

Those 40 persons who scaled the clinic walls were arrested and subsequently indicted by a grand jury and charged with violating 18 U.S.C. §§ 111 and 1509. Section 111, a felony, provides in part:

Whoever forcibly assaults, resists, opposes, impedes, intimidates or interferes with any person designated in section 1114 of this title while engaged in or on account of the performance of his official duties, shall be fined not more than $5,000 or imprisoned not more than three years, or both.

Section 1509, a misdemeanor, provides:

Whoever, by threats or force, willfully prevents, obstructs, impedes, or interferes with, or willfully attempts to prevent, obstruct, impede, or interfere with, the due exercise of rights or the performance of duties under any order, judgment, or decree of a court of the United States, shall be fined not more than $1,000 or imprisoned not more than one year, or both.

■ The other indicted defendants pled guilty prior to trial. The remaining five defendants filed motions to elect. This court found that the two offenses charged were substantively identical and multiplicitous. Section 111 does not require the use of actual force by the defendant; it is sufficient if there is proof that actual force was threatened, and that the defendant acted in a manner as to inspire fear of pain, bodily harm, or death. *United States v. Bamberger*, 452 F.2d 696, 699 n. 5 (2nd Cir.1971), *cert. denied*, 405 U.S. 1043, 92 S.Ct. 1326, 31 L.Ed.2d 585 (1972). This force element thus may be satisfied by proof of a threat of immediate harm which would inspire fear in a reasonable person. *United States v. Walker*, 835 F.2d 983, 987 (2d Cir.1987). *See also United States v. Cunningham*, 509 F.2d 961 (D.C.Cir.1975).

■ The force element of § 1509 has never been construed by any court, and the United States contended that § 1509 requires a lesser level of force than § 111. The court was not able to accept this distinction. Both statutes use the same or similar language, making it an offense to interfere with a court order or a government agent by force or by threat of force. Moreover, those cases which have defined the nature of the force or threat which will satisfy the requirements of § 111 have not relied upon any source unique to that statute, but upon the general, common understanding and definition of the term "force." *See Bamberger*, 452 F.2d at 699 n. 5 (defining term on basis of Webster's Third International Dictionary). Thus, the interpretations of the force element of § 111 are equally appropriate for the interpretation of the similar language in § 1509.

The sole substantial distinction between the two statutes is the nature of the object with which the defendant interferes, assaults, or impedes: a designated government officer acting in the performance of his duties (under § 111), or a court order (under § 1509). In the present case, the marshals were in place to enforce the order of the court. The offenses were therefore identical. Accordingly, the court required the United States to elect the charge with which it wished to proceed. The United States elected to proceed with the misdemeanor charge under § 1509 after objecting to the court's ruling. The United States also sought leave for a stay of the case while the ruling was appealed. The request was denied, and the case proceeded to trial.

Prior to resolving the various post-trial motions raised by defendants Leber, Matson, Turner, and Taylor, the court must first address the separate motion advanced by defendant Cooley. Defendant Cooley's motion for acquittal or in the alternative for a new trial was filed on January 3,

1992, 38 days after the verdict of guilty was returned and the jury discharged.

Cooley's motion for new trial is presented without benefit of counsel. At all stages in the present case, the court has undertaken repeatedly to inform defendant Cooley of his rights under the law, including his right to counsel. And, although Cooley himself undertook most of the work in support of his defense at trial, he was nonetheless represented therein by his personal attorney, who was present during the trial in both an advisory and a standby capacity.

Under the Federal Rules of Criminal Procedure, a defendant may submit a motion for acquittal after the jury has returned a verdict of guilty if the motion is made "within 7 days after the jury is discharged or within such further time as the court may fix during the 7–day period." Fed. R.Crim.P. 29. A motion for new trial based on newly discovered evidence must be made within two years of judgment. If the motion is premised on any other grounds, the motion must be made "within 7 days after verdict or finding of guilty or such further time as the court may fix during the 7–day period." Fed.R.Crim.P. 33.

■■■ The 7–day requirement imposed for a motion for new trial, on any grounds other than newly discovered evidence, is a jurisdictional limit on the district court's ability to grant relief. *United States v. Miller*, 869 F.2d 1418 (10th Cir.1989). Similarly, the time requirement imposed by Rule 29 for the making of a motion for acquittal is also a jurisdictional limitation on the ability of the trial court to grant the requested relief. *Rowlette v. United States*, 392 F.2d 437, 439 (10th Cir.1968).

Defendant Cooley did not file his motions within the required 7–day time period. Nor, during that time, did he seek to obtain an extension of time for the filing of a motion. The court did issue orders allowing additional time for the filing of briefs, but each of these orders merely provided an extension for the filing of briefs and not an extension for the filing of any motion pursuant to Fed.R.Crim.P. 29 or 33. Thus,

the court's order of December 18, 1991 explicitly stated that "each defendant is now at liberty to supplement his or her *pending motions* with briefs on or before January 3, 1992." (Case No. 91–10066, Dkt. No. 50 (emphasis added)).

Since Cooley failed to file his motions for post-trial relief within the required time limits, and failed to timely obtain an extension of time for filing, his motions must be denied. The court has no jurisdiction to grant the relief sought in Cooley's motions. Accordingly, the court hereby denies defendant's motion for acquittal or in the alternative for new trial.

1. *Motions for Acquittal*

■■■ The court will first address the motions for acquittal raised by the remaining defendants. Common to both the motion of defendant Taylor and the joint motion filed on behalf of defendants Turner, Matson, and Leber is the general argument that there was insufficient evidence to support the jury's verdict. In resolving a motion for acquittal, the trial court must

> view the evidence in the light most favorable to the government and then determine whether there is substantial evidence from which a jury might properly find the accused guilty beyond a reasonable doubt.... [The trial court may] enter a judgment of acquittal only if the evidence that defendant committed the crime is nonexistent or so meager that no reasonable jury could find guilt beyond a reasonable doubt.

*United States v. White*, 673 F.2d 299, 301 (10th Cir.1982) (citations omitted). *See also United States v. Lane*, 883 F.2d 1484 (10th Cir.1989), *cert. denied*, 493 U.S. 1059, 110 S.Ct. 872, 107 L.Ed.2d 956 (1990).

Viewing the evidence in the light most favorable to the United States, the court finds that there was sufficient evidence to support the convictions of the defendants. The United States presented the testimony of two of the marshals who were present at the clinic on East Kellogg on August 20. Testifying were Ken Pekarek, the United States Marshal for Kansas, and Denis Amico, United States Marshal supervising the

Wichita division of the marshal's office. During their testimony, these marshals described the events of August 20 and how the actions of the activists on that day were wholly unlike prior "rescue" activities.

On the days prior to August 20, the marshals had extensive information from the leaders of the protests and from other contacts concerning the target and size of any upcoming "rescue" event. And each of these prior events took the same form: in order to block the entrance to a clinic, the activists slowly and very peacefully approached the gate guarded by the marshals.

This situation changed on August 20. The marshals learned from their contacts that members of the rescue movement were frustrated because the marshals, cooperating with the local police, had developed a system for expeditiously arresting and removing persons attempting to block access to the clinics protected by the injunction, with the result that access to the clinics was disrupted for only a few minutes. The marshals then received further information that two particularly militant anti-abortion groups, the Lambs of God and the Missionaries of the Unborn, were coming to Wichita. On the night of August 19, all sources of information to the marshals ceased. No information from any source, either that night or the following day, was forthcoming which would give any indication of the size, the target, or the methods of the next "rescue" event.

On the morning of August 20, and as they had done each day during the previous weeks, the marshals periodically repeated a summary of the court's preliminary injunction over a bullhorn to the assembled crowd. By 11:00 a.m., Marshal Pekarek learned that something was going to happen. He further learned that four groups of 10 persons had been assigned to perform some particular action. He was unable, however, to learn the nature of the planned activity.

At about noon, buses started to arrive from the hotel which was serving as the headquarters of the rescue leadership. A few minutes later, in an apparently coordinated movement, the different segments of the crowd undertook a series of actions. First, protestors blocked a car down the street as it approached the clinic, and several police officers moved towards the car. When that occurred, another group of protestors crossed to block the gate from the outside, while other persons climbed the fence or walls to enter the interior of the clinic lot. They then moved across the lot to block the gate from the inside. Unlike prior "rescue" events, these people moved very rapidly in charging toward the gate.

Marshal Pekarek testified that when he saw the crowd enter the clinic grounds and charge toward the gate he was afraid for his own safety and for the safety of the other marshals. Knowing that only one marshal was on the inside of the gate, Pekarek testified that, for some 30 to 45 seconds, he felt an intense fear for the safety of his men. The party which entered inside the clinic grounds by jumping the fence appeared to Marshal Pekarek to be more determined in their actions than those who remained outside.

Marshal Amico's testimony was similar. The actions of the crowd that day were different from all previous protests. Instead of a slow, quiet, and peaceful attempt to block the clinic access, groups of loudly yelling persons ran, climbed, and jumped their way toward the marshals and police officers guarding the clinic gate. Marshal Amico testified that he experienced a fear that the actions of the parties inside the gate would lead to the harm of some person, including himself. He also testified that the actions of the persons who entered into the clinic grounds interfered with his ability to keep the clinic open to its clients.

Taking all the evidence in the light most favorable to the prosecution, the court finds that there was sufficient evidence for the convictions of the defendants. The jury had before it evidence which, if found credible and accepted by the jury, fully supports the charged offense. Accordingly, the court finds that the defendants' motions for acquittal should be and are hereby denied.

### 2. *Motions for New Trial*

In considering the various motions for new trial, the court will first take up the arguments made jointly by defendants Turner, Matson, and Leber. These defendants argue first, that the court erred in responding to one of the questions posed by the jury during its deliberations, and second, that the court erred in failing to recuse. After addressing each of these arguments, the court will turn to the various points raised by defendant Taylor.

■ Under Fed.R.Crim.P. 33, this court may grant a motion for new trial if it is "required in the interest of judgment." The defendant seeking new trial has the burden to demonstrate that prejudicial error exists, and the motion for new trial should not be granted if the defendant's substantial rights have not been affected. 3 C. Wright, *Federal Practice and Procedure: Criminal 2d,* § 551 (1982). "Courts disfavor new trials, and exercise great caution in granting them." *United States v. Troutman,* 814 F.2d 1428, 1455 (10th Cir. 1987) (citations omitted). Because motions for new trial are not regarded with favor, such motions are granted only with great caution, being addressed to the sound discretion of the court, *United States v. Page,* 828 F.2d 1476 (10th Cir.), *cert. denied,* 484 U.S. 989, 108 S.Ct. 510, 98 L.Ed.2d 508 (1987), and the decision to grant or deny the motion will not be disrupted on appeal absent a plain abuse of discretion. *United States v. Maestas,* 523 F.2d 316 (10th Cir. 1975).

■ During the course of its deliberations, the jury asked five questions. In the first portion of its third question, the jury asked:

> May the jurors consider the cumulative effect of 40 individuals performing an action in determining the guilt or innocence of each defendant who acted as one of the 40[?]

The court answered this portion of the jury's question in the affirmative.

All defendants now complain that their conviction is improper since they were not charged in the respective indictments with conspiracy or aiding and abetting. They argue that individual guilt was not established by the evidence, and that their convictions reflect "vicarious liability" for the actions of other persons in the crowd.

The arguments of the defendants misapprehend the nature of individual guilt and imputed guilt. The defendants were not convicted on the basis that, while they peacefully waited across the street, distinct acts of criminal violence were committed by other persons in the crowd. If that was the sole basis for the charges against the defendants, the government indeed would have been required to prove that each of the defendants conspired or aided and abetted the persons committing those acts of violence.

But those were not the grounds for the present prosecution. Instead, the defendants themselves willfully joined the mob which rushed the gates and grounds of the clinic which were guarded by the marshals. The defendants were not tried for the actions of others but for their own participation in the perceived threat to the safety of the marshals and their interference with the ability of the marshals to carry out their own obligations.

The third question posed by the jury was not directed at the creation of "vicarious liability" for the actions of other persons in a conspiracy, but was directed at the nature of the force or threat of force created by the mob which rushed the gate. In the remaining two parts of the third question, the jury asked for a definition of "threat" and of "force." The first portion of the question is directed at the same subject: asking whether the "cumulative effect" of the mob can be used in determining the level of threat perceived by the marshals. Far from creating collective guilt for the actions of others, the jury's question is limited to the nature of the threat created by the mob which the defendants willfully joined and participated in. Thus, the jury asked whether it could consider the total threat created by "40 individuals performing an action in determining the . guilt or innocence of each defendant *who acted as one of the 40."* (Emphasis added).

The jury was carefully instructed that the guilt of each defendant must be determined individually. Instruction No. 8 provided:

> Although there are multiple defendants in this action, it does not follow from that fact alone that if one is liable, all are liable. Each defendant is entitled to a fair consideration of his own defense and is not to be prejudiced by the fact, if it should become a fact, that you find against the other. Unless otherwise stated, all instructions given you govern the case as to each defendant.

This requirement that guilt or innocence be determined individually was repeated throughout the instructions. Thus, Instruction No. 10, setting forth the basic elements of the crime, required that the jury must find each element beyond a reasonable doubt "as to each defendant." And in Instruction No. 16, the jury was told:

> [Y]ou are here to determine the guilt or innocence of the accused from the evidence in this case. Defendant is not on trial for any act or conduct not alleged in this case. Neither are you called upon to return a verdict as to the guilt or innocence of any other person or persons not on trial as a defendant in this case.

The defendants' contentions that they were convicted on the basis of collective responsibility rather than individual guilt is utterly without merit. The defendants willfully participated in the crowd's simultaneous rush of the areas protected by the marshals. The marshals testifying at trial stated that this rush of the crowd caused them to fear for their safety. It is the view of this court that the jury was properly instructed that the jury could consider the threat created by the crowd in determining the reasonableness of the fear felt by the marshals.

The defendants thus do not stand convicted on the basis of the actions of others, or on the basis of conspiring with others to do acts of violence. Rather, they have been found guilty on the basis of their individual participation in the rush of the gates, and the fear which their actions helped to inspire. The guilt of the defendants is not the guilt of others which is imputed to them, but the consequence of their own willful actions in rushing the gate. The uncontradicted testimony of the marshals protecting the gate is that the actions of the defendants caused or contributed to their resulting sense of alarm for their own safety and for the safety of others.

The second argument advanced by defendants Turner, Matson, and Leber is that the court erred in failing to grant their motions for recusal. Recusal may be required under either 28 U.S.C. § 144, where the movant presents facts establishing a personal bias or prejudice on the part of the trial judge, or under 28 U.S.C. § 455, where there are circumstances which would cause a reasonable man or woman to question the impartiality of the trial judge. *United States v. Gigax*, 605 F.2d 507, 510–11 (10th Cir.1979). *See United States v. Gipson*, 835 F.2d 1323 (10th Cir.), *cert. denied*, 486 U.S. 1044, 108 S.Ct. 2038, 100 L.Ed.2d 623 (1988). However, "[t]here is as much obligation for a judge not to recuse when there is no occasion for him to do so as there is for him to do so when there is. A judge should not recuse himself on unsupported, irrational or highly tenuous grounds." *Hinman v. Rogers*, 831 F.2d 937, 939 (10th Cir.1987). *See also United States v. Bray*, 546 F.2d 851 (10th Cir.1976).

██ The mere fact that a judge has made a prior decision adverse to one of the parties currently before the court does not establish bias or prejudice sufficient to compel recusal. *See United States v. Gigax*, 605 F.2d at 511 (citing *United States v. Baker*, 441 F.Supp. 612 (M.D.Tenn.1977)). Nor does the mere fact of general familiarity with the facts of a case due to earlier proceedings compel recusal. *In re Beard*, 811 F.2d 818 (4th Cir.1987).

Initially, it may be noted that the defendants do not cite a single instance of supposed prejudice or bias occurring during the trial. Indeed, the court exercised considerable effort to guarantee the rights of the accused. The court took pains to en-

sure that defendants, several of whom conducted their trial efforts without benefit of counsel, were fully informed of their rights. Prior to trial, the court also granted the defendants' motion to elect. As a result, the defendants faced trial only on the misdemeanor offense of interference with a court order under § 1509, rather than the felony offense of assaulting a marshal in violation of § 111.

Defendants Turner, Matson, and Leber identify with particularity only two potential bases for questioning the impartiality of the court. First, they suggest that since the court authorized the presence of the marshals at the clinics, it might have been called to testify as to the nature of the marshals' duties. Second, the defendants express the view that the impartiality of the court may be questioned since "[t]here are those who have made alleged threats . . . and it has been requested by some that the Pope excommunicate the judge from his church." (Defs.' Brief, at 7–8.) There is no evidence that any of the defendants have been involved in either the threats or the requested excommunication.

■ Neither of these two concerns advanced by defendants would compel or even justify a recusal. With regard to the first basis for recusal cited by defendants, the specific duties of the marshals were not in question at any time during the trial. Indeed, it was accepted by every party that the marshals were required to maintain access to the clinic pursuant to the court's preliminary injunction. The defendants themselves are forced to acknowledge in their brief that the "request [for the court to testify] was not made by the defendants." That request never occurred for the reason that defendants never contested the reason for the marshals' presence, and the scope of their duties was never contested by the defendants. Moreover, any inquiry into the justification for the marshals' presence was irrelevant to the charges against the defendants.

■ In a similar fashion, the court cannot accept the second of the two justifications for recusal—that somehow the actions undertaken by third persons are an indication of bias or prejudice on the part of the court. It would ill serve the interests of justice if recusal was allowed on such a basis. The undertakings described by defendants have played not the slightest role in the court's handling of the present case. Moreover, if the mere existence of an anonymous threat required recusal, any person who possesses access to a public telephone would have a veto over which judge may try a given case.

The mere fact of a judge's receipt of an anonymous or third party threat does not justify recusal. *See United States v. Dalfonso,* 707 F.2d 757 (3d Cir.1983) (recusal unnecessary on basis of unsubstantiated telephone allegations by third persons of judicial corruption); *In re Extradition of Singh,* 123 F.R.D. 140, 149 (D.N.J.1988) (recusal not justified on basis of threatening letter sent to judge). *Compare United States v. Cerrella,* 529 F.Supp. 1373 (S.D.Fla.1982) (recusal is justified where defendant expressed intent to murder judge, and despite investigation, persisted in plans to execute murder contract).

To adopt the position advanced by defendants herein "would only encourage litigants to send threats in the hope of forcing recusal and obtaining a different judge." *Singh,* 123 F.R.D. at 149. The Third Circuit expressed the same concern in *Dalfonso:*

> An anonymous telephone call to the FBI or to the judge himself, or a telephone call to the prosecuting attorney by an imposter falsely claiming that an effort was being made to influence or even corrupt the trial judge, might open avenues for judge shopping by impelling the trial judge to recuse. We cannot reasonably call into question the impartiality of a presiding judge upon so tenuous a basis as a telephone call, made by a meddler or even an accused, suggesting that the judge might succumb to improper inducements.

707 F.2d at 761. *See also United States v. Hillsberg,* 812 F.2d 328 (7th Cir.), *cert. denied,* 481 U.S. 1041, 107 S.Ct. 1981, 95 L.Ed.2d 821 (1987) (recusal was not required on basis of judge's receipt of letter

from defendant's mother asking for mercy, since, if argument allowed, "any defendant who wished a change of judge would require no more than a note from his mother.").

The *Dalfonso* court stressed that this potential problem had been anticipated by the framers of the recusal statute, and is reflected in the resulting requirement that there must exist a *reasonable* basis for questioning the impartiality of the trial judge. While parties have a right to face a judge free from any reasonable question as to the judge's impartiality, " 'they are not entitled to judges of their own choice.' " *Id.*, at 761 (quoting H.R.Rep. No. 1453, 93d Cong., 2d Sess., *reprinted in* 1974 U.S.C.C.A.N. 6351, 6355).

In determining whether a reasonable person would question the impartiality of the trial judge, the focus necessarily must rest on the alleged extrajudicial actions of the judge. The unilateral conduct of a nonlitigant, which reasonably does not affect the ability of the trial judge to hear the case before him, should not serve as a basis for recusal in the ordinary case.

Here, the various undertakings alluded to by the defendants do not provide a sufficient basis for recusal. Just as the defendants concede that there was no real issue as to the nature of the marshals' duties at the clinics, so also the defendants concede that the various threats and other acts of harassment borne by the court "are not the actions of reasonable persons." (Defs.' Brief, at 8.) The standard for recusal cannot be predicated upon the existence of such behavior by a nonparty.

■ Thus the defendants' request for recusal rests, at bottom, not upon any specific evidence or indicia of a lack of impartiality, but upon a generalized concern that the court is unsympathetic to the defendants' point of view with regard to the issue of abortion and the tactics of "rescue," as reflected in the rulings reached by the court in separate civil proceedings. In its rulings in that action, this court has attempted to follow the law. It has acted to protect the legitimate rights of both the plaintiffs and the defendants in the civil case, and it has sought to preserve and protect the rule of law to the best of its ability.

At the same time, there is no justification for the suggestion that the court suffers from bias or prejudice in this criminal proceeding, that the court has or would allow any extraneous matter to intrude upon the findings of the court or the deliberations of the jury, or that the defendants received anything less than a fair trial. The mere fact of prior adverse rulings, even in the same case or in prior litigation involving the same parties, is not a sufficient basis for recusal. *Christensen v. Ward,* 916 F.2d 1462 (10th Cir.), *cert. denied,* —— U.S. ——, 111 S.Ct. 559, 112 L.Ed.2d 565 (1990); *United States v. Mobile Materials, Inc.,* 881 F.2d 866 (10th Cir.1989), *cert. denied,* 493 U.S. 1043, 110 S.Ct. 837, 107 L.Ed.2d 833 (1990); *Willner v. Budig,* 848 F.2d 1032 (10th Cir.1988), *cert. denied,* 488 U.S. 1031, 109 S.Ct. 840, 102 L.Ed.2d 972 (1989). Thus, in *United States v. Carroll,* 567 F.2d 955 (10th Cir.1977), the mere fact that a trial judge had previously ruled against tax protestors was found to be an insufficient basis for recusal in subsequent contempt proceedings for violation of an IRS summons. As the joint motion for new trial of defendants Turner, Matson, and Leber is without merit, that motion is hereby denied.

Defendant Taylor's motion for acquittal or in the alternative for new trial presents several arguments not contained in the motion submitted on behalf of the other defendants. Of the 15 assorted points of error raised by Taylor, four (Nos. 1, 8, 13 & 14) present issues the substance of which the court has addressed above, and are therefore denied. Of the remaining 12 points of error, several repeat the same basic concerns. The court will address each of the remaining concerns as they appear in the defendant's brief.

■ Taylor first argues that the jury was confused, and that the court erred "because it made no effort to discover the nature of the jury's misunderstanding." (Def.'s Brief, at 4.) The asserted error is premised upon an unfounded view of the

jury's deliberations. There is no evidence that the jury was confused in the present action. During the course of its deliberations, the jury submitted five separate questions seeking clarification of various points of law. In the view of the court, there is no basis for the conclusion that the submission of these questions reflects anything more than the jurors' conscientious performance of their oath to the court.

To the contrary, the questions submitted by the jury simply reflect the court's statement—unobjected to by any defendant—to the jury that if it needed clarification of any point of law, it should not hesitate to submit a written question on the subject. This instruction follows this court's long practice, and is designed to ensure that the jury fully and fairly understands the law. In the view of the court, the questions submitted by the jury merely reflect a response to that enjoinder.

Indeed, the questions actually submitted by the jury reflect the insightful nature of the jury's deliberations. For example, the jury asked whether it was necessary to have proof that the marshals would have acted differently if there had been no force or threat of force. The jury asked whether a causal relationship was necessary between the various elements of Instruction No. 10, that is, whether the interference or obstruction must be shown to be the result of the acts or threats of force. These questions, like the others submitted by the jury, demonstrate merely the jury's fulfillment of its obligation to carefully consider the facts and the law.

The suggestion by Taylor that the jury was confused is therefore not supported by any evidence available to the court. It is wholly speculative. The further suggestion that the court should have attempted to clarify this situation by entering into some sort of dialogue with the jury is equally unacceptable. In the view of the court, the jury conscientiously, carefully, and without confusion, performed its office.

■ The next point advanced by defendant Taylor is that the United States failed to prove that he was aware of the prelimi-nary injunction which the marshals were enforcing. In support of this contention, Taylor cites the decision of the First Circuit in *United States v. Griffin*, 525 F.2d 710 (1st Cir.1975), *cert. denied*, 424 U.S. 945, 96 S.Ct. 1414, 47 L.Ed.2d 351 (1976), where the court held that in a prosecution under § 1509 the government is obliged to prove the defendant was aware of the court order which was obstructed.

It is surprising that Taylor fails to describe the decision in *Griffin* beyond this bare statement of the court's holding. In *Griffin*, the defendant was prosecuted for attempting to thwart a federal order requiring school desegregation. The defendant's conviction under § 1509 was reversed since there was absolutely no evidence offered to support knowledge of the court order:

Defendant did not take the stand, and there was no direct evidence as to his actual knowledge. The government offered a quantity of newspaper and television files intended to show wide publicity, but the court excluded them. It is not altogether clear why it did. Possibly it was because the files were not separated so as to distinguish between reports of the court order and general accounts of busing. The government offered no other evidence, such as testimony of notoriety or general knowledge of the order in the neighborhood. The evidence of the crowd's conduct cannot support the jury verdict since there is nothing indicating that the members of the crowd realized that the busing it protested emanated from a federal court order as distinguished from some other source of authority. We agree with the district court that *it would not be necessary to show knowledge of the specific terms of the order, and we might have no problem if the government had introduced evidence of broad neighborhood knowledge or publicity,* but absent evidence from which to infer awareness of the order by the defendant, we must find that the government did not make out its case.

525 F.2d at 713 (footnotes omitted; emphasis added).

In the present case, Taylor testified that he was unfamiliar with the terms of the preliminary injunction or the temporary restraining order. However, he admitted during his testimony that in preparation for the events of August 20 at the East Kellogg clinic, he had been told to be nonviolent and obey the instructions of the marshals, thereby demonstrating that he had some general knowledge of the federal presence protecting the clinic. In addition, the jury heard the testimony of the general notoriety of the court's order from Marshals Pekarek and Amico. This general notoriety was again reflected in the testimony of the other defendants, who testified that news accounts of events stemming from the court's order were what impelled them to travel to Wichita to undertake "rescue" activities. In addition to the evidence of general notoriety, there is the uncontradicted testimony of Marshal Amico of the repeated efforts of the marshals to communicate the substance of the order to the crowd several times each day. Indeed, Marshal Amico testified that he specifically recalled the use of the bullhorn to repeat the order to the crowd between 12:10 and 12:15 p.m. on August 20, only a few minutes before the defendant and other persons in the crowd climbed the clinic's fences and charged the gate.

The First Circuit's analysis in *Griffin* is directly reflected in Instruction No. 12. There was ample evidence presented to the jury on the issue of knowledge or notoriety of the court's order to support the jury's finding of guilt. Defendant Taylor's claim of error is therefore without merit.

■ In his next assignment of error, Taylor takes exception to Instruction No. 11, in which the jury was informed that "a violation of the statute exists if a defendant's conduct involved a threat or display of physical aggression which would reasonably have inspired fear of immediate pain or bodily harm in a reasonable person acting under the directions contained in the court's order." Taylor argues that, instead of "reasonable person," this instruction

should have used the term, "reasonable U.S. Marshal."

Instruction No. 11 is taken from the decision of the Second Circuit in *United States v. Walker,* 835 F.2d 983 (2d Cir.1987). As noted earlier, although *Walker* involves a violation of § 111 rather than § 1509, the court has found that that case's description of the former statute's force element is directly useful in defining the scope of the force or threat of force element of the latter.

Although the instruction does not explicitly require the jury to consider the knowledge and expertise of the marshals, as marshals, the instruction does require the jury to find that a defendant's conduct was such that it would reasonably inspire fear in a reasonable person "acting under the directions contained in the court's order." Under the case as presented to the jury, the only persons acting under the directions of the court's orders were Marshals Pekarek and Amico. This was further clarified in the court's answer to the jury's third question, where it stated that the jury must find that there was a threat or display of physical aggression "toward the officers." Instruction No. 15, in assessing the credibility of witnesses, explicitly requires the jury to consider "all of the evidence," which, on the issue of the reasonableness of the marshals' professed sense of danger, would include their background in law enforcement.

The defendants cross-examined the government's witnesses as to their experience and knowledge of law enforcement. The defendants stressed during the presentation of evidence and during closing arguments the status of these witnesses as United States Marshals in determining the reasonableness of their fears. The court finds that the use of the term "reasonable person" in Instruction No. 11 is not an error requiring a new trial of the defendant.

Next, defendant Taylor contends that the court's use of the *Walker* decision was inappropriate, since § 1509, unlike the statute at issue in that case, does not expressly

list fear as an element. This, of course, is literally true.

But then, by its literal terms, § 1509 is in fact broader than § 111, at least as it relates to its "force element." Both statutes apply to instances of the use of "force." Only § 1509 expressly includes "threats." However, the force element of § 111 has been held to include threats of immediate harm. *Walker*, 835 F.2d at 987. However, as noted above, the Second Circuit's definition of force in *Walker* was based upon common understandings and usage of the term—not upon any consideration which would be unique to § 111. As a result, the definition of force reached in *Walker* is equally applicable to actions under § 1509.

■ In the remaining portion of Taylor's argument on the present point, Taylor attempts to distinguish *Walker* on the basis that, for example,

Walker had been on probation for a felony conviction; defendant has no prior felonies. Walker violated that probation by using drugs; defendant doesn't and hasn't used drugs. Walker entered private areas of federal properties; [the East Kellogg] clinic is not federal property.

(Def.'s Brief, at 14.) While these distinctions may be relevant to the fact finder in determining the ultimate issue of guilt, or to this court for sentencing considerations, they are not valid bases for refusing to recognize the rule of law adopted in *Walker*.

Taylor argues generally that he was no threat to any of the marshals, since he "possessed only a Bible and pro-life material. He possessed no gun, knife, or anything else that could be considered a weapon." (Def.'s Brief, at 16.) Section 1509 contains no requirement of the use of a weapon during the commission of the criminal act. Rather, the statute requires simply the use of force, which must be taken to understand to include the application of physical action which reasonably inspires fear in the person that is the subject of the force. The jury was instructed on precisely such requirements. As stated earlier, the court finds that there was substantial competent evidence to support the verdict of guilty.

■ Taylor also takes exception to Instruction No. 14, which informed the jury that good faith was not a defense to the charge against the defendants. The jury was instructed that in deciding the case,

it is immaterial whether the defendant held the personal belief that the court order was improper or invalid and therefore should not be obeyed. It is not a defense to this charge that a defendant held a good faith belief that the order was invalid or improper. Therefore, you should not consider any personal beliefs held by one or more of the defendants as to the validity of the court order in determining whether a defendant is guilty or not guilty.

In contending that this instruction was error, Taylor provides no argument and little support. Instead, he merely flourishes quotations from decisions such as *United States v. Seeger*, 380 U.S. 163, 184, 85 S.Ct. 850, 863, 13 L.Ed.2d 733 (1965) (the validity of what one believes cannot be questioned; these are inquiries foreclosed to government); and *United States v. Macintosh*, 283 U.S. 605, 625, 51 S.Ct. 570, 575, 75 L.Ed. 1302 (1931), *overruled by Girouard v. United States*, 328 U.S. 61, 66 S.Ct. 826, 90 L.Ed. 1084 (1946) ("We are a Christian people, according to one another the equal right of religious freedom, and acknowledging with reverence the duty of obedience to the will of God.").

None of the cited cases is relevant here. *Macintosh* and *Seeger* involved issues relating to naturalization and the scope of the conscientious objector statute, 50 U.S.C.Appx. § 456(j). Neither case provides support for the view that sincere religious convictions provide a defense to the charge of forcibly obstructing a court order under § 1509. The Tenth Circuit has observed, after quoting the same language of the Supreme Court in *Macintosh:* "A person may not decide for himself whether a law is good or bad and if bad, that he is free to disobey it." *Warren v. United States*, 177 F.2d 596 (10th Cir.1949), *cert.*

*denied,* 338 U.S. 947, 70 S.Ct. 485, 94 L.Ed. 584 (1950).

Taylor next contends that the indictment against him should have been dismissed due to purported discrepancies in the grand jury testimony of Marshal Amico. For example, Marshal Amico "failed to explain to the Grand Jury the exact duties of the of the [sic] United States Marshal's office." Taylor claims that Amico misled the grand jury when he stated that someone read a copy of the injunction over the bullhorn, while a videotape of the morning's events at the clinic purportedly shows that the bullhorn was not working that day.

These and the other cited instances in Marshal Amico's testimony do not justify the granting of a new trial. At best, the defendant's maundering complaints and alleged discrepancies in Amico's testimony represent potential arguments of credibility to the fact finder. They do not warrant or justify a new trial, however. There is nothing to support the view that an exact description of the marshals' duties at the clinics was necessary for the grand jury's indictment. The cited videotape demonstrates that after some initial difficulty, the marshals' bullhorn was working on August 20. There is nothing in the various allegations of misconduct before the grand jury which would require or support the finding that the indictment was unfairly reached or that the defendant's rights were prejudiced.

The defendant's allegation (Def.'s Brief, at 23) that "[t]he indictment was a 'rubber stamp' indictment" is not supported by the evidence available to the court. To the contrary, the grand jury was instructed by the government to take up the indictments individually, and there is nothing to suggest that the grand jury departed from this charge.

Taylor next argues that the court erred in failing to instruct the jury that his "good character may alone create 'reasonable doubt'" as to his guilt. Taylor's argument is premised on *Greer v. United States,* 227 F.2d 546 (10th Cir.1955). This argument is not well founded. In *Greer,*

the court held that in a given case "the circumstances may be such that an established reputation for good character, if relevant to the issue, would alone create a reasonable doubt." 227 F.2d at 549. Taylor, however, presented no relevant character evidence, either by means of character witnesses, or direct testimony by himself, as to his reputation for a given character trait. As a result, the failure to give the instruction now sought by Taylor is not an error justifying the award of a new trial.

Taylor contends that the court erred in failing to grant his motion for severance. The determination of whether to sever is a matter which rests within the discretion of the trial court. In exercising that discretion, the court must weigh the prejudice which may result from a joint trial against the expense and inconvenience of separate trials. The bare allegation that a defendant would stand a better chance of acquittal in a separate trial or that there may be some "spillover effect" from evidence against a co-defendant is insufficient to compel severance. The trial court's decision granting or denying severance will be disturbed on appeal only upon an affirmative showing of an abuse of that discretion. *United States v. Cardall,* 885 F.2d 656, 667 (10th Cir.1989); *United States v. Hack,* 782 F.2d 862, 870 (10th Cir.), *cert. denied,* 476 U.S. 1184, 106 S.Ct. 2921, 91 L.Ed.2d 549 (1986).

The court finds that the allegation of error in failing to sever is without merit. As with other arguments of the defendant addressed previously herein, this allegation is premised on the supposed confusion of the jury. Again, this supposition is wholly speculative. In the view of the court, the instant case presented no issues so complex or difficult as to require or justify severance.

Taylor next charges that his prosecution is the result of a constitutionally impermissible selective prosecution. Taylor's argument is that only the 40 persons who jumped the fence and blockaded the gate from the inside were prosecuted; the persons who charged and blockaded the

gate from the outside were not prosecuted. This argument was correctly rejected by the court prior to trial. There is not the slightest support for the suggestion that the decision to prosecute the persons who entered onto the clinic grounds was premised on constitutionally impermissible criteria. *See Wayte v. United States*, 470 U.S. 598, 105 S.Ct. 1524, 84 L.Ed.2d 547 (1985). The defendant has failed to demonstrate that this decision to prosecute the persons who climbed the clinic's fences, entered into the interior grounds of the clinic, and blocked access to the clinic from the inside is the result of an invidiously discriminatory motive on the part of the government.

■ Finally, Taylor contends that the court erred in failing to give a "nullification" instruction—that notwithstanding the law or the facts of the case, the jury should feel free to acquit the defendant according to some innate sense of justice. In support of this argument, Taylor quotes Judge Leventhal in one of the leading cases on jury nullification, *United States v. Dougherty*, 473 F.2d 1113, 1133 (D.C.Cir.1972): "It is unjust to withhold information on the jury power of nullification."

Although the court endeavors carefully to accord persons appearing without benefit of counsel all the benefits of due process and interpret the pleadings of such persons liberally, such rights do not extend to an ability to distort or mislead. The quoted statement of Judge Leventhal is taken from a portion of his opinion in which he is summarizing the views of the appellants. That this statement is not the conclusion of the court is made manifest in his ultimate conclusion. After an exhaustive review of the history of the principle of jury nullification, Judge Leventhal unequivocally and unmistakably rejected the argument that the jury should be informed of the doctrine. However important a role jury nullification may have played in our historical jurisprudence, instructing a jury on the principle is both wrong and dangerous.

What makes for health as an occasional medicine would be disastrous as a daily diet. The fact that there is widespread existence of the jury's preroga-

tive, and approval of its existence as a 'necessary counter to case-hardened judges and arbitrary prosecutors,' does not establish as an imperative that the jury must be informed by the judge of that power. On the contrary, it is pragmatically useful to structure instructions in such wise that the jury must feel strongly about the values involved in the case, so strongly that it must itself identify the case as establishing a call of high conscience, and must independently initiate and undertake an act in contravention of the established instructions. This requirement of independent jury conception confines the happening of the lawless jury to the occasional instance that does not violate, and viewed as an exception may even enhance, the over-all normative effect of the rule of law. An explicit instruction to a jury conveys an implied approval that runs the risk of degrading the legal structure requisite for true freedom, for an ordered liberty that protects against anarchy as well as tyranny.

473 F.2d at 1136–37.

Other federal courts addressing the issue have overwhelmingly agreed, finding that nullification instructions should not be issued. *United States v. Desmarais*, 938 F.2d 347 (1st Cir.1991); *United States v. Powell*, 936 F.2d 1056, 1062–63 (9th Cir. 1991); *United States v. Kerley*, 838 F.2d 932, 938 (7th Cir.1988); *United States v. Anderson*, 716 F.2d 446, 450 (7th Cir.1983); *United States v. Trujillo*, 714 F.2d 102 (11th Cir.1983); *United States v. Drefke*, 707 F.2d 978 (8th Cir.), *cert. denied*, 464 U.S. 942, 104 S.Ct. 359, 78 L.Ed.2d 321 (1983); *United States v. Simpson*, 460 F.2d 515, 519–20 (9th Cir.1972).

IT IS ACCORDINGLY ORDERED this 18 day of February, 1992, that the motions for acquittal or in the alternative for new trial filed jointly by defendants Matson, Turner and Leber, and individually by defendants Taylor and Cooley, are hereby denied.